[Civ. No. 35783. First Dist., Div. Three. May 27, 1975.]

G. RAYMOND ARNETT, as Director, etc., Plaintiff and Appellant, v. FIVE GILL NETS et al., Defendants; RAYMOND MATTZ, Intervener and Respondent.

## COUNSEL

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, and Roderick Walston, Deputy Attorney General, for Plaintiff and Appellant.

No appearance for Defendant.

Greene, Hollman & Smith, Richard A. Smith and James F. King, Jr., for Intervener and Respondent.

## OPINION

**BROWN (H. C.), Acting P. J.**—This is an appeal from a judgment involving the jurisdiction of the State of California (State) to regulate fishing by Indians on the Klamath River Reservation.

In September of 1969, a California game warden seized five gill nets owned by Raymond Mattz, a Klamath River Indian. The Department of Fish and Game, through its director, petitioned the Superior Court of Del Norte County for authority to sell or destroy the nets. Mattz intervened in the action, claiming that the Fish and Game Code was not applicable to Indians fishing on their reservation. When the petition was first heard, the trial court found that the Klamath River Reservation, at the place where the nets were seized, was not Indian country and, therefore, the gill nets prohibited by the Fish and Game Code were subject to seizure. On certiorari, the United States Supreme Court in *Mattz* v. *Arnett* (1973) 412 U.S. 481 [37 L.Ed.2d 92, 93 S.Ct. 2245],

reversed this judgment and held that the lower 20 miles of the Klamath River on which the nets were seized was still a reservation despite the opening of the land to non-Indian settlement in 1892. The cause was remanded for a determination of "the existence of Mattz' fishing rights and to the applicability of California law notwithstanding reservation status." (412 U.S. at p. 485 [37 L.Ed.2d at p. 95].)

The trial court concluded that the State may not regulate fishing by Indians on the Klamath River Reservation due to the fact that the federal government in transferring jurisdiction over Indian reservations to the State of California exempted the fishing rights here involved. The court ordered the nets returned to Mattz and the State has appealed.

Mattz "is a Yurok, or Klamath River, Indian who, since the age of nine, regularly fished, as his grandfather did before him, with dip, gill, and trigger nets, at a location called Brooks Riffle on the Klamath River. ... The nets were stored near Brooks Riffle, approximately 200 feet from the river, and within 20 miles of the river's mouth." (412 U.S. at p. 484 [37 L.Ed.2d at p. 95].)

The property on which the nets were found is owned by a private logging company. Although an 1892 Act of Congress opened the reservation land for settlement, the resulting ownership by non-Indians did not terminate the reservation but was "completely consistent with continued reservation status." (*Mattz v. Arnett, supra,* at p. 497 [37 L.Ed.2d at p. 102].) The court explained, citing *Seymour v. Superintendent* (1962) 368 U.S. 351, 357-358 [7 L.Ed.2d 346, 350-351, 82 S.Ct. 424]): " 'The Act did no more [in this respect] than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards.' "

The land on which the nets were found is a part of what will be referred to as the Hoopa Valley Indian Reservation. The Hoopa Valley Indian Reservation is composed of three sections, as illustrated by the map below, which is included as an appendix to the opinion in *Mattz v. Arnett, supra,* following page 506 [37 L.Ed.2d page 108].

## Map of Hoopa Valley Indian Reservation, California*

### Scale: 1 inch = 12 miles

LEGEND:     Old Klamath River Reservation.

                            Connecting Strip.

                            Original Hoopa Valley Reservation.

*United States Department of Interior, General Land Office 1944.

The nets were found on the portion of Indian land known as the Klamath River Reservation, a 2-mile wide strip of land extending from the mouth of the Klamath River on the Pacific Ocean for approximately 20 miles inland. The land was originally reserved for Indian use in 1855. By Act of March 3, 1853 (10 Stat. 238) the President was authorized to make reservations in the State of California for Indian purposes, and the Klamath River Reservation was made by presidential executive order two years later. In 1876, the 12-mile square area known as the Original Hoopa Valley Reservation was formally set aside by another executive order and in 1891 was extended to include the Klamath River Reservation and also a 30-mile strip in between these areas referred to on the map as the "Connecting Strip." The Supreme Court in *Mattz* v. *Arnett* explained that the reservations had been consolidated as one because an act passed in 1864 (13 Stat. 39) had authorized the President to set apart no more than four tracts for Indian reservations in California and by 1891, four reservations had already been so set apart. (412 U.S. at p. 493 [37 L.Ed.2d at pp. 99-100]; see also *Short* v. *United States* (1973) 486 F.2d 561 [202 Ct.Cl. 870] for history of reservation.)

Mrs. Brooks, intervener's mother, testified that her family fished with gill nets for their own personal use without State interference until the 1940's. During her girlhood, in the early years of the century, most of the Indians on the lower 20 miles of the river made their living by commercial fishing. Her son, however, fishes only for the subsistence of his family. Fish is a staple of his family's diet and, according to intervener's testimony, he can only catch sufficient fish for his family's needs by means of gill nets.

The State makes no effort to limit gill netting by Indians elsewhere on the Hoopa Valley Indian Reservation, i.e., on the connecting strip or the original Hoopa Indian Reservation. (See Fish & G. Code, § 12300.) On the Klamath River Reservation, the only method of taking fish that has been permitted is angling. In 1933, the State enacted Fish and Game Code section 429.8 (now § 7155) providing that Yurok Indians could obtain a permit to fish on the Klamath for subsistence without regard to seasons and under certain conditions not permitting gill netting. According-ing to the testimony at trial, there has never been an application for a section 7155 permit. The Indians continue gill netting and suffering occasional arrests and confiscation of nets.

■ We agree with the trial court that the State did not acquire jurisdiction to regulate the fishing rights here involved by the transference of jurisdiction over Indian reservations to California. In 1953, jurisdiction over Indian reservations and over Indians on such reservations was transferred from the federal government to California by the passage of Public Law 280 (67 Stat. 588, 18 U.S.C. § 1162; 28 U.S.C. § 1360.) Public Law 280 provides, however, that its application shall not "deprive any Indian or any Indian tribe, band, or community of any right, privilege or immunity afforded under any Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

The State takes the position that the asserted fishing rights here were not based on a treaty, statute or agreement but on executive order because the reservation itself was created by executive order. The Attorney General cites the case of *Sioux Tribe* v. *U.S.* (1942) 316 U.S. 317 [86 L.Ed. 1501, 62 S.Ct. 1095], as illustrative of the fact that there is a distinction drawn by the United States Supreme Court between Indian rights based on treaties and executive orders. The *Sioux Tribe* case is indeed informative but does not support the Attorney General. The Great Sioux Reservation was an Indian reservation whose borders had been delineated by treaty but a part of the public domain bordering on the reservation had been set aside for Indian purposes solely by executive order.[1] Later, executive orders returning the additions to the public domain were challenged by the Indians and compensation claimed. In denying the claims of the Indians, the court stated that "Since the Constitution places the authority to dispose of public lands exclusively in Congress, the executive's power to convey any interest in these lands must be traced to Congressional delegation of its authority." (316 U.S. at p. 326 [86 L.Ed. at p. 1507].)

Here the creation of the reservation can be traced to congressional authority, i.e., the Act of March 3, 1853 (10 Stat. 238) by which the President was " 'authorized to make five military reservations from the public domain in the State of California or the Territories of Utah and New Mexico bordering on said State, for Indian purposes.' " (See *Mattz* v. *Arnett, supra,* 412 U.S. at p. 487 [37 L.Ed.2d at p. 96].) Whatever rights the Indians had on the reservation, therefore, were not created by executive order but by statute.

---

[1]The order was deemed necessary for the suppression of the liquor traffic with the Indians. (316 U.S. at p. 320 [86 L.Ed. at p. 1504].)

The State argues that this conclusion is contrary to the legislative intent and that the language "treaty, agreement, or statute" must be strictly construed to exclude fishing rights on reservations created by executive order even where the ultimate authority is statutory. The United States Supreme Court in *Metlakatla Indians* v. *Egan* (1962) 369 U.S. 45 [7 L.Ed.2d 562, 82 S.Ct. 552], did not accept an interpretation of the subject language to exclude fishing rights promulgated by regulation where the right to make the regulation was given by statute. The court explained at pages 56-57 [7 L.Ed.2d at pages 570-571]: "This statute [Public Law 280] expressly protects against state invasion all uses of Indian property authorized by federal treaty, agreement, statute, or regulation, but only those fishing rights and privileges given by federal treaty, agreement, or statute. It might plausibly be argued, therefore, that fishing rights given by regulation are not protected and state jurisdiction is established. Legislative history is silent as to the interpretation of the provision. See H.R. Rep. No. 848, 83d Cong., 1st Sess.; S. Rep. No. 699, 83d Cong., 1st Sess.; 99 Cong. Rec. 9962, 10782, 10928 (1953). The apparent purpose of the proviso was to preserve federally granted fishing rights. It would be sheer speculation to attribute significance to the imperfect parallelism of the provisions protecting property and fishing rights in the absence of any suggested reason for excluding fishing rights based on regulations. The process of statutory drafting and evolution, here veiled from scrutiny, is too imprecise to permit such an inference. Cf. *United States* v. *Mersky*, 361 U.S. 431, 437. In any event, the proviso also protects rights given the Indians by statute respecting the control and regulation of fishing, and the 1891 statute gave the Metlakatlans the right to fish under regulations of the Secretary of the Interior."

The Attorney General takes the position that he has now unveiled legislative history which indicates that congressional intent. For one thing, the State points out that Congress rejected the words "*law*, treaty, or agreement" in favor of "*statute*, treaty, or agreement." The Attorney General's position is that the intent of Congress was to exempt only those fishing rights *expressly* given to the Indians by the requisite instrument, whether it be statute, treaty, or agreement, and not to exempt rights which can only be inferred from a treaty, agreement, or statute. The choice of words, however, to designate the source of the protected right ordinarily would indicate nothing as to whether only an "expressed" right rather than an "inferred" right will be protected. As evidence of legislative intent, however, the Attorney General has offered a memorandum written on February 18, 1954, by the Assistant Commissioner of Indian Affairs to the California Area Director of the Bureau of Indian

Affairs (BIA), which explained the reason for the language used as follows: "By recommending that the words 'federal law, treaty or agreement' be changed to 'Federal treaty, agreement or statute,' it was intended to make clear that the rights, privileges or immunities to be preserved or protected were those which the Indians *expressly* reserved in treaties or agreements with the United States or which were *expressly* granted to Indians in a Federal statute." (Italics added.)

The Attorney General also draws the court's attention to letters from the years 1953-1954 from various persons within the BIA generally stating that there were no California Indian hunting and fishing rights granted by treaty, agreement, or statute. It is respondent's position on these documents that, while it is true that an administrative interpretation as to the meaning of a statute is to be given respect, it is far from conclusive. (*County of Marin* v. *United States* (1958) 356 U.S. 412 [2 L.Ed.2d 879, 78 S.Ct. 880].)

Public Law 280 does not state that fishing rights derived from treaty, agreement, or statute will only be protected if the right was *expressly* granted. No reason appears why the manner in which the right was granted would make it more or less worthy of protection and it is concluded that no such limitation should be read into Public Law 280. It has been decided several times that the creation of a reservation "for Indian purposes" encompasses the right to hunt and fish on the reservation without further specification. (See *Menominee Tribe* v. *United States* (1968) 391 U.S. 404 [20 L.Ed.2d 697, 88 S.Ct. 1705]; *United States* v. *White* (8th Cir. 1974) 508 F.2d 453, 457; *Donahue* v. *Justice Court* (1971) 15 Cal.App.3d 557, 562 [93 Cal.Rptr. 310]; *Kimball* v. *Callahan* (9th Cir. 1974) 493 F.2d 564, 566; *Quechan Tribe of Indians* v. *Rowe* (S.D.Cal. 1972) 350 F.Supp. 106, 111.) This is particularly clear on the reservation in question which was obviously chosen with reference to the fishing. As the United States Supreme Court stated: "The site was ideally selected for the Yuroks. They had lived in the area; the arable land, although limited, was 'peculiarly adapted to the growth of vegetables.' 1856 Report 238; and the river, which ran through a canyon its entire length, abounded in salmon and other fish. *Ibid.*; 1858 Report 286." (412 U.S. at p. 487 [37 L.Ed.2d at pp. 96-97].)

Since the Indians on the Klamath River Reservation had fishing rights derived from Congress, State qualifications of those traditional rights was precluded by force of the Supremacy Clause. (*Antoine* v. *State of Washington* (1975) 420 U.S. 194 [43 L.Ed.2d 129, 95 S.Ct. 944, 951].) Thus,

the attempt of the State to regulate fishing by passage of section 7155 of the Fish and Game Code was invalid even before the passage of Public Law 280.[2] It is now also improper because of the renewed guarantee of Indian fishing rights by Public Law 280.

Because of the conclusion that the fishing rights here derived from statute within the meaning of Public Law 280, it is unnecessary to consider the State's lengthy argument that there were no fishing rights derived from an "agreement" within the meaning of Public Law 280 and unnecessary to consider the dictum to this effect in *Elser* v. *Gill Net Number One* (1966) 246 Cal.App.2d 30 [54 Cal.Rptr. 568].

The Attorney General also contends that even if reservation status was not terminated by the Act of 1872, the State could at least regulate fishing on reservation lands owned by non-Indians. This does not appear to be the consequence of opening a portion of the reservation to settlement by non-Indians. (See *Seymour* v. *Superintendent* (1962) 368 U.S. 351, 357-358 [7 L.Ed.2d 346, 350-351, 82 S.Ct. 424].) In a case in which reservation status was found to have been terminated, the United States Supreme Court noted: "If the lands in question are within a continuing 'reservation,' jurisdiction is in the tribe and the Federal Government 'notwithstanding the issuance of any patent, [such jurisdiction] including rights-of-way running through the reservation.' 18 U.S.C. § 1151(a). On the other hand, if the lands are not within a continuing reservation, jurisdiction is in the State, except for those land parcels which are 'Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.' 18 U.S.C. § 1151(c)." (*DeCoteau* v. *District County Court* (1975) 420 U.S. 425, 427 [43 L.Ed.2d 300, 304, 95 S.Ct. 1082, 1084, fn. 2].)

The case of *Antoine* v. *State of Washington, supra,* involved an attempt by the State of Washington to regulate hunting by Indians on land which had once been a reservation but which had been ceded to the United States by the Indians. The Indians, however, had retained hunting rights through agreement ratified by Congress. The court held that the supremacy clause precluded state qualification of those rights. In a concurring opinion, Mr. Justice Douglas remarked: "An effort is made to

---

[2]The trial court's conclusion that the Legislature passed section 7155 in the mistaken belief that Klamath River Reservation was no longer a reservation is reasonable. The State took the position in *Mattz* v. *Arnett* that the reservation had been terminated in 1892 when Congress opened the area to settlement. The legislative motive, however, does not appear to be relevant to the validity of the legislation.

restrict these hunting rights to public lands, not to tracts ceded by this *Agreement and taken up by private parties*. The Agreement, however, speaks only of the ceded tract, not the ultimate disposition of the several parts of it. We would strain hard to find an implied exception for parcels in the ceded tract that ended up in private ownership. . . . Whether the result would be different if the contest were between the owner of the private tract and the Indian is a question that need not be reached. We have here only an issue involving the power of a State to impose a regulatory restraint upon a right which Congress bestowed on these Indians." (420 U.S. at p. 212 [43 L.Ed.2d at p. 142, 95 S.Ct. at p. 954].) Here, too, we are not involved in a dispute between the owner of private land and the Indians. And it is noted that, although the nets were concededly upon private land when seized, the fishing was undertaken by intervener from a spot known as Brooks Riffles from which his family traditionally fished.

The State finally argues that the State has a right under its police power to qualify the Indian fishing rights on the reservation in the interest of conservation and contends that section 7155 is a proper conservation measure. The State relies upon two cases involving Indian fishing rights wherein the United States Supreme Court has narrowly construed the fishing rights to permit state regulation of the rights in the interest of conservation. (*Puyallup Tribe* v. *Dept. of Game* (1968) 391 U.S. 392 [20 L.Ed.2d 689, 88 S.Ct. 1725]; *Kake Village* v. *Egan* (1962) 369 U.S. 60 [7 L.Ed.2d 573, 82 S.Ct. 562].) Both cases, however, involved off-reservation fishing and "[e]ven where reserved by federal treaties, off-reservation hunting and fishing rights have been held subject to state regulation." (369 U.S. at p. 75 [7 L.Ed.2d at p. 584].) In both cases, also, the Indians were fishing commercially as well as for subsistence and regulation was seen as a necessity to prevent extermination of the fish runs. No case has come to our attention which has applied the power of a state to regulate fishing on an Indian reservation in the interest of conservation.

This court in *Donahue* v. *Justice Court, supra,* 15 Cal.App.3d 557, a case involving fishing rights on the original Hoopa Valley Reservation, in dictum, noted that "the state is not precluded from exercising its general police power under factual situations reasonably requiring the exercise of such power," and cited *People* v. *Rhoades,* 12 Cal.App.3d 720 [90 Cal.Rptr. 794], in which the State was permitted to exercise its police power on a reservation in enforcing a safety regulation requiring removal of flammable growth adjacent to a building. The State contends that the

danger to the salmon from gill netting on the Klamath is such as to require State intervention in the interest of preserving the fish. The record on this argument is not persuasive. While it is recognized that the line at which State intervention might be necessary has not been drawn, several factors militate against the success of an argument of necessity here. First, the problem with gill netting is simply that it increases the number of fish taken from the river and the State does not want the fish taken from the river before they can get to the hatcheries or spawning grounds. Yet, the hatcheries are over 100 miles from the mouth of the river and the State only proposes restricting gill netting on the first 20 miles. By statute it permits gill netting on the other sections. (Fish & G. Code, § 12300, see *Elser* v. *Gill Net Number One, supra,* 246 Cal.App.2d 30.) Apparently, the Indians, if removed from their traditional fishing grounds, could move a few miles away and gill net the salmon again before they reached the hatcheries. The State's argument for necessity is also weakened by the fact that no showing has been made that other conservation methods could not first be tried. For example, sport fishing is still permitted below the hatcheries and there is no evidence as to the extent of this fishing. Testimony was introduced that the salmon runs have decreased markedly in the last 30 to 40 years; the Indians have been gill netting for subsistence for over a century. Witnesses for the State had no figures on the size of the catch through gill netting. There is no evidence of substance in the record that would lead to the conclusion that subsistence fishing by Indians is the cause of the decrease in the salmon runs and that regulation of this fishing is the only means of solving the problem. Before the State is permitted to make inroads into subsistence fishing by Indians on their own reservation, all other conservation methods should be exhausted.

The judgment is affirmed.

Scott, J., and Devine, J.,* concurred.

A petition for a rehearing was denied June 26, 1975, and appellant's petition for a hearing by the Supreme Court was denied July 23, 1975.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.