[Crim. No. 23387. July 26, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER McCOVEY, JR., et al., Defendants and Appellants.

518

520

**COUNSEL**

George Forman, under appointment by the Supreme Court, David Rapport, Lester Marston, Stephen Quesenberry and Anthony M. D'Anna for Defendants and Appellants.

George Deukmejian, and John K. Van de Kamp, Attorneys General, R. H. Connett, Assistant Attorney General, Roderick E. Walston, Charles W.

Getz IV, Mary E. Hackenbracht and Bruce S. Flushman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BIRD, C. J.—Is the state preempted from regulating the off-reservation sale or possession for sale of fish caught by Hoopa Valley Reservation Indians on the reservation?

I.

Appellant, Walter McCovey, Jr., is a Yurok[1] Indian of the Hoopa Valley Reservation located in northern California. This reservation includes a one-mile strip of land on each side of the Klamath River from the river's mouth at the Pacific Ocean to its confluence with the Trinity River. At that point, the reservation widens to a 12-mile square. (See *post,* at pp. 523-524.)[2]

Sometime in September 1980, appellant McCovey caught with a gill net[3] a large quantity of salmon from the Klamath River on the Hoopa Valley Reservation. Shortly thereafter, McCovey telephoned a fish wholesaler in San Jose and offered to sell him the salmon.

After agreeing to locate a buyer for the salmon, the wholesaler learned that it was illegal to sell salmon which had been gill-netted from California waters. He called McCovey back, informed him that it was unlawful to sell the salmon, but agreed to see if another buyer would purchase the fish. The wholesaler then notified an officer of the California Department of Fish and Game about the telephone conversations with McCovey.

Working with a Fish and Game Department officer, the wholesaler contacted one of his customers who agreed to pose as a buyer for the salmon. The "buyer" telephoned McCovey and arranged a purchase of approximately 100 king salmon with a wholesale value of over $3,100. Arrangements were made to deliver the salmon to the wholesaler.

---

[1] Yurok means "down the river." (*Mattz* v. *Arnett* (1973) 412 U.S. 481, 486 [37 L.Ed.2d 92, 96, 93 S.Ct. 2245].)

[2] A map of the reservation, which was appended to the opinion in *Mattz* v. *Arnett, supra,* 412 U.S. 481, following page 506 [37 L.Ed.2d 92, at p. 107], is provided in the appendix to this opinion.

[3] A gill net is "a flat net suspended vertically in the water with meshes that allow the head of a fish to pass through or become entangled." (25 C.F.R. § 250.4.) When a fish gets caught in the net, it helplessly struggles to free itself. In the process, the net takes a band of scales off the fish leaving markings referred to as "gill net marks."

The following day, McCovey and his codefendant, Lance Wilkie, who is not an Indian of the Hoopa Valley Reservation,[4] delivered the salmon to the wholesaler. Both appellants were then arrested by Fish and Game Department officers.

McCovey and Wilkie were charged with a felony violation of Fish and Game Code section 8685.6.[5] They were also charged with a violation of section 2002, which prohibits the possession of any fish taken in violation of any of the provisions of the Fish and Game Code, and with a conspiracy to violate section 2002.

Appellants moved to dismiss the charges under Penal Code section 995. The trial court granted the motion to dismiss the section 2002 counts, but denied it with respect to the section 8685.6 count. Following the submission of the case on the preliminary hearing transcript, the trial court found appellants guilty of violating section 8685.6. McCovey was fined $2,500 and placed on probation for three years on the condition that he serve ninety days in the county jail. Wilkie was fined $500 and placed on probation for one year.[6] McCovey and Wilkie appeal.

Appellants present three principal, interrelated contentions. First, they argue that state prosecution of reservation Indians for off-reservation conduct involving fish caught on a reservation infringes upon the Indians' federally protected right to fish on the reservation. Next, they assert that Department of the Interior regulations which govern Indian fishing on the reservation preempt the state from prosecuting Hoopa Valley Reservation Indians for the off-reservation possession or sale of reservation-caught fish. Finally, they contend that section 8685.6 as applied to reservation Indians for sale of reservation-caught fish impermissibly discriminates against and

---

[4]Although it is not entirely clear from the record, it appears that Wilkie is an Indian of the McCaw Tribe which is located in the State of Washington.

[5]Section 8685.6 provides: "It is unlawful to sell or possess for sale any salmon, steelhead, or striped bass which were taken in California waters by the use of a gill net." That statute was enacted as urgency legislation, effective July 11, 1980. (Stats. 1980, ch. 393, § 2, p. 775.)

All statutory references are to the Fish and Game Code unless otherwise noted.

[6]At the time appellants violated section 8685.6, the maximum punishment for a violation of that section was imprisonment in the state prison or county jail for not more than one year, or a $5,000 fine, or both. (§ 12004, added by Stats. 1980, ch. 393, § 4, p. 775.) Section 12004 was subsequently amended to provide that if the value of the fish involved exceeds $400, the maximum punishment for violating section 8685.6 is a $10,000 fine, or imprisonment in state prison or county jail for not more than one year, or the revocation of any wholesale fish dealer's license issued pursuant to section 8040, or any combination of these penalties. If the value of the fish involved does not exceed $400, the maximum punishment is a $500 fine, or imprisonment in the county jail for six months, or both. (Stats. 1982, ch. 1079, § 2, p. 3907; Stats. 1983, ch. 1092, § 104.)

burdens Indian commerce in violation of the federal Constitution. (U.S. Const., art. I, § 8, cl. 3.)

Appellant McCovey also maintains that the imposition of a felony sentence on a Hoopa Valley Reservation Indian for a violation of section 8685.6 constitutes cruel and/or unusual punishment in violation of the federal and state Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) In addition, appellant Wilkie urges that if the state were without jurisdiction to prosecute McCovey, Wilkie's conviction should also be reversed.

## II.

A brief history of the Hoopa Valley Reservation is useful to place this case in context.

Legislation passed by Congress in 1853 authorized the President "to make . . . reservations . . . in the State of California . . . for Indian purposes." (10 Stat. 238 (Mar. 3, 1853); see *Mattz* v. *Arnett, supra,* 412 U.S. at p. 487 [37 L.Ed.2d at p. 96].) The Klamath River Reservation was established by executive order two years later. (*Ibid.*) In 1864, Congress passed an act authorizing the President to set apart no more than four tracts of land in California "for the purposes of Indian reservations." (13 Stat. 40 (Apr. 8, 1864); see *Mattz* v. *Arnett, supra,* 412 U.S. at p. 489 [37 L.Ed.2d at p. 97].) Pursuant to that act, the Hoopa Valley Reservation was formally set aside for Indian purposes by executive order in 1876. (*Id.,* at p. 490, fn. 9 [37 L.Ed.2d at p. 98].)

In 1891, the reservation "was extended so as to include all land, one mile in width on each side of the [Klamath] river, from 'the present limits' of the [original] Hoopa Valley Reservation to the Pacific Ocean. The Klamath River Reservation, or what had been the reservation, thus was made part of the Hoopa Valley Reservation, as extended." (*Id.,* at p. 493 [37 L.Ed.2d at p. 100]; see also *Elser* v. *Gill Net Number One* (1966) 246 Cal.App.2d 30, 33-34 [54 Cal.Rptr. 568] and *Donnelly* v. *United States* (1913) 228 U.S. 243, 253-259 [57 L.Ed. 820, 823-827, 33 S.Ct. 449] for additional historical background on the establishment of the Hoopa Valley Reservation.)

Today, the Hoopa Valley Reservation consists of 3 sections: (1) the Old Klamath River Reservation, a 2-mile wide strip of land, 1 mile in width on each side of the Klamath River, which extends 20 miles inland from the mouth of the river on the Pacific Ocean; (2) the original Hoopa Valley Reservation, a 12-mile square area, containing approximately 89,000 acres, which lies on both sides of the Trinity River; and (3) a 30-mile strip along

the Klamath River which connects (1) and (2). (See *Arnett* v. *Five Gill Nets* (1975) 48 Cal.App.3d 454, 456-458 [121 Cal.Rptr. 906], cert. den. (1976) 425 U.S. 907 [47 L.Ed.2d 757, 96 S.Ct. 1500]; *Elser* v. *Gill Net Number One, supra,* 246 Cal.App.2d at pp. 33-34.)

In 1977, in order to fill the regulatory vacuum created by the lack of a tribal governing body, the Department of the Interior (hereafter Department) promulgated interim regulations governing Klamath River fishing by Indians of the Hoopa Valley Reservation. (42 Fed.Reg. 40904-40905 (Aug. 12, 1977).) Those regulations expressly permitted limited commercial fishing. (*Id.,* at p. 40905, §§ 258.1(c), 258.5.) The preamble to the regulations promulgated a year later expressly recognized that the federally reserved Indian fishing right included the right to fish for commercial purposes. (43 Fed.Reg. 30048 (July 13, 1978).) However, as the preamble noted, the right was not absolute: "[T]he Indians must be allowed to fish commercially as long as statistics show that there can be effective conservation, with simultaneous regulation of other forms of fishing by all persons." (*Ibid.*)

In 1979, in light of decreased salmon runs, the Department promulgated new regulations which imposed a moratorium on commercial fishing and the sale of fish caught on the reservation.[7] (44 Fed.Reg. 17144-17151 (Mar. 20, 1979).) However, the Department reaffirmed the existence of the right to fish commercially and guaranteed that it could be exercised when salmon runs increased. (*Id.,* at p. 17146.) The 1979 moratorium remains in effect, having been renewed in successive versions of the regulations. (25 C.F.R. § 250.8(d), (e).)

### III.

■ This court must decide whether California is preempted from regulating the off-reservation possession or sale of fish caught by Hoopa Valley Reservation Indians on the reservation.

■ "[T]here is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." (*White Mountain Apache Tribe* v. *Bracker* (1980) 448 U.S. 136, 142 [65 L.Ed.2d 665, 671-672, 100 S.Ct. 2578] [hereafter *White Mountain*

---

[7]The Department recognized that the vast majority of Klamath River salmon (i.e., those who were born there and would presumably return to spawn if able) are taken by offshore ocean fishing and thus never reenter the river. It noted that no effective limitations had previously been imposed on such fishing by agencies having jurisdiction to do so (e.g., the Department of Commerce). A ban on commercial fishing by Indians, the Department concluded, was the only means by which it could ensure that a sufficient number of returning fish escaped to reach the spawning areas at the headwaters, thereby permitting conservation and perpetuation of the resource. (44 Fed.Reg. 17144 (Mar. 20, 1979).)

*Apache Tribe*].) However, the traditional notions of Indian self-government which are "deeply engrained in our jurisprudence" provide a crucial " 'backdrop' " in answering such a question. (*Id.,* at p. 143 [65 L.Ed.2d at p. 672].)

The United States Supreme Court has cautioned that "[i]t must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." (*McClanahan* v. *Arizona State Tax Comm'n* (1973) 411 U.S. 164, 172 [36 L.Ed.2d 129, 136, 93 S.Ct. 1257].) The status of these tribes has been described as " ' " "an anomalous one and of complex character," ' for despite their partial assimilation into American culture, the tribes have retained ' "a. semi-independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations . . . ." ' " (*White Mountain Apache Tribe, supra,* 448 U.S. at p. 142 [65 L.Ed.2d at p. 672].)

■ Congress, however, has broad power to regulate Indian tribes under the Indian Commerce Clause. Thus, "[t]he right of tribal self-government is ultimately dependent on and subject to the broad power of Congress." (*White Mountain Apache Tribe, supra,* 448 U.S. at pp. 142-143 [65 L.Ed.2d at pp. 671-672].) ■ This power, along with the tribes' semi-independent position, has "given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." (*Id.,* at p. 142.) First, state authority may be preempted by federal law. Second, it may interfere with " 'the right of reservation Indians to make their own laws and be ruled by them.' " (*Ibid.,* quoting *Williams* v. *Lee* (1959) 358 U.S. 217, 220 [3 L.Ed.2d 251, 254, 79 S.Ct. 269].) "The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." (*White Mountain Apache Tribe, supra,* 448 U.S. at p. 143 [65 L.Ed.2d at p. 672].)

■ The doctrine of preemption applies in a "special sense" to cases involving Indians and Indian tribes. (*New Mexico* v. *Mescalero Apache Tribe* (1983) 462 U.S. 324, 333-334 [76 L.Ed.2d 611, 620, 103 S.Ct. 2378, 2386].) "Although a State will certainly be without jurisdiction if its authority is preempted under familiar principles of preemption, . . . prior cases [do] not limit preemption of State laws affecting Indian tribes to only those circumstances." (*Ibid.*) In fact, the Supreme Court has noted that "[t]he unique historical origins of tribal sovereignty make it generally unhelpful" to apply preemption standards that have emerged in other areas of

the law to cases where Indians are federally regulated. (*White Mountain Apache Tribe, supra,* 448 U.S. at p. 143 [65 L.Ed.2d at p. 672].)

As the court has explained, "[t]ribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other." (*Ibid.*) In addition, the court has rejected the proposition that Indian preemption requires "an express congressional statement to that effect." (*Id.,* at p. 144 [65 L.Ed.2d at p. 673].) Rather, the Indian preemption question requires "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." (*Id.,* at p. 145 [65 L.Ed.2d at p. 673].)

■ The Indian preemption cases focus on the scope and the nature of federal regulation in the area. Where there exists a "pervasive" or "comprehensive" federal regulatory scheme, state laws are preempted if they appear to "disturb and disarrange" that scheme. (*Warren Trading Post* v. *Tax Comm'n.* (1965) 380 U.S. 685, 690-691 [14 L.Ed.2d 165, 168, 85 S.Ct. 1242]; accord *New Mexico* v. *Mescalero Apache Tribe, supra,* 462 U.S. at p. 324 [76 L.Ed.2d at p. 623, 103 S.Ct. at p. 2388].)

Examples of this focus abound. In *Warren Trading Post* v. *Tax Comm'n., supra,* 380 U.S. 685, the Supreme Court held that a state could not tax the gross income on sales made to reservation Indians at a retail trading post located on the reservation. (*Id.,* at pp. 691-692 [14 L.Ed.2d at p. 168].) The court emphasized the presence of "comprehensive" and "all-inclusive" regulations and statutes showing that "Congress ha[d] taken the business of Indian trading on reservations so fully in hand that no room remain[ed] for state laws imposing additional burdens upon traders." (*Id.,* at p. 690 [14 L.Ed.2d at p. 168].)

In *Ramah Navajo School Bd.* v. *Bureau of Revenue* (1982) 458 U.S. 832 [73 L.Ed.2d 1174, 102 S.Ct. 3394], the Supreme Court held that federal law preempts a state from taxing the gross receipts that a non-Indian construction company receives from a tribal school board for construction of an Indian school on a reservation. (*Id.,* at pp. 834, 846-847 [73 L.Ed.2d at pp. 1177-1178, 1185-1186].) The court noted that "[f]ederal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive." (*Id.,* at p. 839 [73 L.Ed.2d at p. 1181].) Thus, "the comprehensive federal regulatory scheme and the express federal policy of encouraging tribal self-sufficiency in the area of education preclude the imposition of the state gross receipts tax in this case." (*Id.,* at pp. 846-847 [73 L.Ed.2d at p. 1186].)

In *White Mountain Apache Tribe, supra,* 448 U.S. 136, the Supreme Court held that federal law preempted the imposition of state motor carrier

license and use fuel taxes on a non-Indian logging company for its activities on the reservation. The court observed that the federal regulatory scheme for harvesting and selling Indian timber was so pervasive that it precluded imposition of the state taxes. (*Id.*, at p. 148 [65 L.Ed.2d at p. 675].) The court also emphasized that the state taxes would obstruct federal policies. (*Ibid.*) In particular, the state taxes would undermine the "general federal policy of encouraging tribes 'to revitalize their self-government' and to assume control over their 'business and economic affairs.' [Citation.]" (*Id.*, at p. 149 [65 L.Ed.2d at p. 676].)[8]

The foregoing principles were recently applied in *New Mexico v. Mescalero Apache Tribe, supra,* 462 U.S. 324 [76 L.Ed.2d 611, 103 S.Ct. 2378] (hereafter *Mescalero*). Since *Mescalero* is one of the Supreme Court's latest pronouncements in the area, a detailed analysis of that case is useful to the resolution of the preemption issue.

With extensive federal assistance and supervision, the Mescalero Apache Tribe established a comprehensive scheme for the management of the reservation's fish and wildlife resources on its New Mexico reservation. (*Mescalero, supra,* 462 U.S. at p. 325 [76 L.Ed.2d at p. 615, 103 S.Ct. at p. 2381].) State authorities sought to prohibit nonmembers of the reservation from possessing game killed in accordance with tribal regulations, but in violation of state regulations.[9] (*Id.*, at pp. 328-329 [76 L.Ed.2d at pp. 616-617, 103 S.Ct. at p. 2383].)

The *Mescalero* court reviewed the principles governing the Indian preemption cases and observed that "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." (462 U.S. at p. 334 [76 L.Ed.2d at p. 620, 103 S.Ct. at p. 2386].) The court then went on to note that in assessing federal and tribal interests, several principles guide

---

[8]Appellants rely heavily on *Central Machinery Co. v. Arizona Tax Comm'n.* (1980) 448 U.S. 160 [65 L.Ed.2d 684, 100 S.Ct. 2592]. The issue in that case was whether a state could tax an on-reservation sale of farm machinery to an Indian tribe where the sale was made by an off-reservation corporation. (*Id.*, at p. 161 [65 L.Ed.2d at p. 686].) Although the seller did not maintain a permanent place of business on the reservation, the court concluded that federal law governed the transaction in a comprehensive manner and, therefore, preempted the asserted state tax. (*Id.*, at pp. 165-166 [65 L.Ed.2d at pp. 689-690].)

Although *Central Machinery* is of no particular assistance in deciding the preemption issue in the present case, it does adhere to the line of Indian preemption cases which emphasize the comprehensiveness of the federal regulatory scheme.

[9]Numerous conflicts existed between state and tribal hunting regulations. For example, the tribe permitted a hunter to kill both a buck and a doe, whereas the state allowed only bucks to be killed. (*Mescalero, supra,* 462 U.S. at p. 329 [76 L.Ed.2d at p. 617, 103 S.Ct. at p. 2383].)

the courts. Both the Indian tribes and the federal government "are firmly committed to the goal of promoting tribal self-government." (*Id.*, at pp. 334-335 [76 L.Ed.2d at p. 621, 103 S.Ct. at p. 2386].) That goal is embodied in numerous federal statutes[10] and "encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging 'tribal self-sufficiency and economic development.'" (*Id.*, at p. 335 [76 L.Ed.2d at p. 621, 103 S.Ct. at pp. 2386-2387].) As a necessary implication of this broad commitment, an Indian tribe has "the power to manage the use of its territory and resources by both members and nonmembers. [Citations.]" (*Id.*, 462 U.S. at p. 335 [76 L.Ed.2d at p. 621, 103 S.Ct. at p. 2387].)

The court then discussed guidelines to be used in assessing the state's interest. "The exercise of State authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity. . . . A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention." (*Mescalero, supra,* 462 U.S. at p. 336 [76 L.Ed.2d at p. 622, 103 S.Ct. at p. 2387].)

It was upon this basis that the court held New Mexico could not superimpose its own hunting and fishing regulations on the tribe's regulatory scheme. (*Mescalero, supra,* 462 U.S. at pp. 342-343 [76 L.Ed.2d at pp. 626-627, 103 S.Ct. at p. 2391].) The court emphasized that "concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation" by members and nonmembers. (*Id.,* 462 U.S. at pp. 339, 342 [76 L.Ed.2d at pp. 624, 626, 103 S.Ct. at pp. 2388, 2391].) In effect, the exercise of state jurisdiction would wholly supplant the tribal regulations. (*Id.,* at p. 338 [76 L.Ed.2d at p. 623, 103 S.Ct. at p. 2388].) Furthermore, permitting state regulation "would completely 'disturb and disarrange' . . . the comprehensive scheme of federal and tribal

---

[10]The court identified several such federal statutes. "For example, the Indian Financing Act of 1974, 25 U.S.C. § 1451 et seq. states: 'It is hereby declared to be the policy of Congress . . . to help develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources and where they will enjoy a standard of living from their own productive efforts comparable to that enjoyed by non-Indians in neighboring communities.' § 1451. Similar policies underlie the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450 et seq., as well as the Indian Reorganization Act of 1934, 25 U.S.C. § 461 et seq. . . . The 'intent and purpose of the Reorganization Act was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism."' [Citation.] The Indian Civil Rights Act of 1968, 25 U.S.C. § 1301 et seq., likewise reflects Congress' intent 'to promote the well-established federal "policy of furthering Indian self-government."' [Citation.]" (*Mescalero, supra,* 462 U.S. at pp. 334-335, fn. 17 [76 L.Ed.2d at p. 621, 103 S.Ct. at pp. 2386-2387].)

management established pursuant to federal law." (*Ibid.*) Finally, the exercise of concurrent jurisdiction would "threaten Congress' firm commitment to the encouragement of tribal self-sufficiency and economic development." (*Id.*, at p. 344 [76 L.Ed.2d at p. 627, 103 S.Ct. at p. 2391].)[11]

Applying the foregoing principles, this court must first determine how comprehensive the federal regulatory scheme is which governs Indian fishing on the Hoopa Valley Reservation. (25 C.F.R. pt. 250.)[12] The express purpose of the regulations is "to protect the fishery resources and to establish procedures for the exercise of the fishing rights of Indians of the Reservation until a Reservation-wide management mechanism is established with the capability to manage and regulate the Indian fisheries on the Reservation. The regulations are intended to promote reasonably equal access to the fishery resources of the Reservation by all Indians of the Reservation, and to assure adequate spawning escapement." (25 C.F.R. § 250.1(a).)

The regulations permit fishing for subsistence and ceremonial purposes only. (25 C.F.R. § 250.8(d).) They specify the types and sizes of nets that may be used and the locations where their use is permitted. (25 C.F.R.

---

[11]Two weeks after *Mescalero* was decided, the Supreme Court decided another Indian preemption case, *Rice* v. *Rehner* (1983) 463 U.S. 713 [77 L.Ed.2d 961, 103 S.Ct. 3291]. In *Rice*, the court held that a state may require a federally licensed Indian trader who operates a general store on an Indian reservation to obtain a license to sell liquor for off-premises consumption. (*Id.*, 463 U.S. at pp. 715-716, 723-736 [77 L.Ed.2d at pp. 967, 973-980, 103 S.Ct. at pp. 3293, 3298-3303].) In concluding that state regulation was not preempted by federal law, the court emphasized that Congress had authorized state regulation of Indian liquor transactions (18 U.S.C. § 1161). (*Rice, supra,* 463 U.S. at pp. 723-736 [77 L.Ed.2d at pp. 973-980, 103 S.Ct. at pp. 3298-3303].) The court further observed that "[i]n the area of liquor regulation, [there are] no 'congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development.' [Citation.]" (*Id.*, 463 U.S. at p. 724 [77 L.Ed.2d at p. 973, 103 S.Ct. at p. 3298.) The court also indicated that the interest in tribal sovereignty was minimal since Indians did not have a tradition of tribal self-government in the area of liquor regulation. (*Ibid.*)

*Rice* is inapposite. In the present case, there is no federal statute authorizing states to regulate Indian fishing on reservations. On the contrary, there is federal law—Public Law 280 (see *post,* at p. 535)—which evidences Congress' intent to preempt state regulation of fishing on reservations. (*Mescalero, supra,* 462 U.S. at p. 340, fn. 25 [76 L.Ed.2d at p. 625, 103 S.Ct. at pp. 2389-2390].) Moreover, Public Law 280 "evidences Congress' understanding that tribal regulation of hunting and fishing should generally be insulated from State interference, since 'Congress would not have jealously protected' tribal exemption from conflicting State hunting and fishing laws 'had it thought that the States had residual power to impose such [laws] in any event.' [Citation.]" (*Mescalero, supra,* 462 U.S. at p. 340, fn. 25 [76 L.Ed.2d at p. 625, fn. 25, 103 S.Ct. at pp. 2389-2390, fn. 25].) It is evident from this statement that Indians have a tradition of self-government in the area of on-reservation fishing.

[12]All further citations to the regulations are to those currently in effect unless otherwise noted. An earlier version of the regulations was operative at the time appellants committed the offense. (See 44 Fed.Reg. 17144-17151 (Mar. 20, 1979).) The regulations presently in effect are substantially similar to those which were operative at that time. Where necessary, relevant differences between the two versions are noted.

§ 250.8(b), (c), (g)-(n), (p), (r), (s) & (t).) In particular, fishing with gill nets is allowed only on certain days and during specified hours. (48 Fed.Reg. 41762-41763 (Sept. 19, 1983) § 250.8(b), (c).)

The regulations require particular markings to be made on fish caught on the reservation (25 C.F.R. § 250.9(a)), and limit the quantity of fish Indians may transport off the reservation without a special permit. (25 C.F.R. § 250.9(b).)[13] In addition, the regulations authorize the Area Director of the Bureau of Indian Affairs to promulgate in-season and emergency regulations when necessary to ensure the proper management of the reservation fisheries, to meet conservation needs, and to protect "spawning escapement." (48 Fed.Reg. 41763 (Sept. 19, 1983).)

Commercial fishing, defined as "the taking of fish or fish parts with the prior or subsequent intent to sell or trade them or profit economically from them," is prohibited.[14] (25 C.F.R. § 250.8(e); 48 Fed.Reg. 41762 (Sept. 19, 1983).) Moreover, "[f]ish caught on the Hoopa Valley Indian Reservation may not be sold." (25 C.F.R. § 250.8(f).)

All "eligible Indians" of the Hoopa Valley Indian Reservation are governed by the regulations and are required to obtain and possess a fisher's identification card[15] before exercising any fishing rights on the reservation. (25 C.F.R. §§ 250.1(c), 250.5, 250.6.)

The regulations also provide that federal and tribal officials and any other person deputized to enforce the regulations have authority to make arrests, seize fishing gear, and issue citations with respect to violations of the regulations. (25 C.F.R. §§ 250.4, 250.14.) Indians who violate the regulations are subject to prosecution before the Court of Indian Offenses of the Hoopa Valley Indian Reservation. (25 C.F.R. §§ 250.14, 250.15; see also 25 C.F.R. pt. 11.) For example, an eligible Indian who violates the regulations by fishing for commercial purposes may be fined up to $500, sentenced to jail for up to 6 months or have his or her fishing rights suspended for up to 180 days. (25 C.F.R. § 250.15(e).)

Finally, it is noteworthy that these regulations governed appellant McCovey's conduct. Jurisdiction of the Indian court specifically extends to off-

---

[13]This limit was not in effect at the time appellants committed their offense.

[14]It was also prohibited at the time of appellants' offense. (44 Fed.Reg. 17149 (Mar. 20, 1979).)

[15]Appellant McCovey possessed such a card when he engaged in the acts leading to the present prosecution.

reservation sales of fish caught on the reservation. (25 C.F.R. § 250.1(c).[16]) As the commentary to the regulations explains, "[o]ne commentator [had] expressed concern that the statement in [25 C.F.R.] § 250.1(c) that violations of the regulations occurring either on or off the reservation are punishable in the court of Indian offenses could be construed as an assertion that the regulations govern Indian fishing off the reservation. Although the regulations govern only fish taken by Indians on the reservation, *they prohibit Indians from selling the fish either on or off the reservation.* The statement in § 250.1(c) has been modified to make it clear that the regulations regulate off-reservation Indian activity only when it involves fish caught on the reservation." (47 Fed.Reg. 32844 (July 29, 1982), italics added.)

There is little question that the exercise of state criminal jurisdiction in this area will "disturb and disarrange" the federal scheme. (*Warren Trading Post* v. *Tax Comm'n., supra,* 380 U.S. at p. 691 [14 L.Ed.2d at p. 169].) Concurrent jurisdiction by the state would supplant the present federal regulatory scheme with an inconsistent dual system.

The federal regulations permit gill nets to be used to a limited extent, while California completely prohibits their use in the taking of salmon, steelhead or striped bass. (Compare 25 C.F.R. § 250.8(b), (c), (h) & (t) with §§ 8685.5, 8685.6.) The penalties for appellants' conduct in this case are more severe under California law. The maximum fine for a violation of section 8685.6 is $10,000, while the maximum fine under the federal regulations is $500. (Cf. § 12004 with 25 C.F.R. § 250.15(e).) Violations of the federal regulations are adjudicated in reservation courts before Indian judges and juries, while violations under the Fish and Game Code are adjudicated in non-Indian courts.

Moreover, state jurisdiction over Indian offenses involving fish caught on the reservation would "effectively nullify" the express purpose of the federal regulations. (*Mescalero, supra,* 462 U.S. at p. 338 [76 L.Ed.2d at p. 623] 103 S.Ct. at p. 2388].) With the state asserting its authority in the area, there would be no incentive for the Hoopa Valley Reservation Indians ever to establish a reservation-wide system capable of managing and regulating the resources of the reservation. If the tribe did establish a system, its authority to regulate would have but a "hollow ring" and the exercise of that authority would be "only at the sufferance of the State." (*Ibid.* [76 L.Ed.2d at p. 624].) Thus, state jurisdiction would thwart Congress' overriding commitment to the encouragement of tribal self-government and economic development.

---

[16]This provision states in pertinent part: "Violations of these regulations that relate to fishing on the reservation are punishable in the court of Indian offenses regardless of whether the offense was committed on or off the reservation."

The remaining inquiry is whether the state interests here are sufficient to justify the exercise of state jurisdiction. (*Mescalero, supra,* 462 U.S. at pp. 334-335 [76 L.Ed.2d at p. 621, 103 S.Ct. at p. 2386].) In this case, the state asserts an interest in conservation.[17]

The state's argument must be considered against the backdrop of United States Supreme Court precedent. No Supreme Court decision in the Indian preemption area has held that a state's interest in conservation justifies a finding of concurrent jurisdiction.[18] In a nonpreemption context, the court has held that a state may, in the interest of conservation, regulate Indian fishing rights which were created by treaty. (*Puyallup Tribe* v. *Dept. of Game* (1968) 391 U.S. 392, 398-399 [20 L.Ed.2d 689, 693-694, 88 S.Ct. 1725] (hereafter *Puyallup I*); *Puyallup Tribe* v. *Washington Game Dept.* (1977) 433 U.S. 165, 173-177 [53 L.Ed.2d 667, 674-677, 97 S.Ct. 2616] (hereafter *Puyallup III*); *Washington Game Dept.* v. *Puyallup Tribe* (1973) 414 U.S. 44 [38 L.Ed.2d 254, 94 S.Ct. 330] (hereafter *Puyallup II*).) However, in those cases, the treaty simply guaranteed the Indians the right to fish in common with other citizens of the state. (*Puyallup I, supra,* 391 U.S. at p. 398 [20 L.Ed.2d at p. 693].) No comprehensive federal regulatory scheme was in place.

■ Even assuming that this distinction is insufficient, state regulation on the basis of conservation is permitted only when (1) it is reasonable and necessary, and (2) it does not discriminate against the Indians. (See *Washington* v. *Fishing Vessel Assn.* (1979) 443 U.S. 658, 682-685 [61 L.Ed.2d 823, 843-845, 99 S.Ct. 3055]; *Puyallup III, supra,* 433 U.S. at pp. 173-177 [53 L.Ed.2d at pp. 674-677]; *Puyallup II, supra,* 414 U.S. at pp. 48-49 [38 L.Ed.2d 254, 257-258]; *Puyallup I, supra,* 391 U.S. at pp. 398-399, 401, fn. 14 [20 L.Ed.2d at pp. 693-694, 695].)

---

[17]The state has prohibited commercial fishing in the Klamath River since 1933. (§ 8434, formerly § 484.5.) It prohibits troll fishing in ocean waters "within three nautical miles north and south of a line drawn due west for three nautical miles from the center" of the mouths of the Klamath and Smith Rivers, and during August and September within a similar but smaller area outside the mouth of the Eel River. (Cal. Admin. Code, tit. 14, § 27.75.) It also limits to two the number of salmon that can be taken by those engaged in sport fishing on the river. (*Id.,* § 27.80.)

[18]*Mescalero* indicates that off-reservation effects of on-reservation activity *may* warrant state intervention where the state points to a need to conserve a "scarce, common supply" of its resources. (462 U.S. at p. 342 [76 L.Ed.2d at p. 626, 103 S.Ct. at p. 2390].) In that case, however, the state could point to no such effects, and conceded "that the Tribe's management ha[d] not had an adverse impact on fish and wildlife outside the reservation." (*Id.,* at p. 342 [76 L.Ed.2d at p. 626, 103 S.Ct. at pp. 2390-2391].)

Moreover, the court specifically rejected the state's claim that deficiencies in enforcement powers compelled the exercise of concurrent jurisdiction, since the tribe could itself exercise such powers as well as rely on federal statutory prohibitions. (*Id.,* at p. 342, fn. 27 [76 L.Ed.2d at p. 627, 103 S.Ct. at p. 2391].)

■ The state's interest in conservation of salmon is adequately protected by the federal regulations. An elaborate federal scheme regulates both on-reservation fishing and off-reservation sales. This factor—entirely absent in the *Puyallup* cases—is itself sufficient to preclude state intervention.[19] Moreover, the existence of accompanying mechanisms for enforcement should adequately dispel the concern that exclusive federal jurisdiction will impact adversely on state resources. (See *Mescalero, supra,* 462 U.S. at p. 626, fn. 27 [76 L.Ed.2d at p. 626, 103 S.Ct. at pp. 2390-2391]; 25 C.F.R. § 250.1(c); 47 Fed. Reg. 32844 (July 29, 1982).)

The state's exercise of concurrent jurisdiction over off-reservation sales of reservation-caught fish by Indians of the Hoopa Valley Reservation clearly interferes and is incompatible with the federal and tribal interests reflected in the comprehensive federal regulatory scheme. Moreover, the state has not shown that its interest in conservation is sufficient to justify assertion of concurrent authority. Thus, the state is preempted from exercising jurisdiction over appellant McCovey.[20]

### IV.

Several subsidiary issues relating to preemption remain.

■ The state argues that the regulations cannot be held to preempt California law because they were promulgated in excess of the Secretary of the Interior's authority.[21] In support of that position, the state relies on *Kake Village* v. *Egan* (1962) 369 U.S. 60 [7 L.Ed.2d 573, 82 S.Ct. 562] (hereafter *Kake Village*).

In *Kake Village*, Alaska sought to enforce its antifish-trap conservation statute against nonreservation Indians. (369 U.S. at p. 62 [7 L.Ed.2d at p. 576].) The Secretary of the Interior (hereafter Secretary) had issued regulations—purportedly under authority of the White Act (48 U.S.C. §§ 221-

---

[19]The *Puyallup II* court based its holding that state intervention was proper in part upon the premise that the police power of the state was necessary to preserve steelhead trout, an important state resource. (414 U.S. at p. 49 [38 L.Ed.2d at p. 258].) Here, the federal "police power"—which presently prohibits all commercial fishing on the reservation and any off-reservation sales of fish caught on the reservation—serves that purpose.

[20]Since appellant McCovey's preemption claim is meritorious, this court need not address any of his other contentions. (See *ante,* at pp. 522-523.)

[21]The regulations at issue were promulgated by the Department pursuant to various statutes. (See 25 C.F.R. pt. 250, Authority; 43 U.S.C. § 1457; 25 U.S.C. §§ 2, 9, 13; Reorganization Plan No. 3 of 1950 (65 Stat. 1262).) Under these statutes, the Department is responsible for the supervision and management of Indian affairs. The Department has noted that its authority extends to "the protection and implementation of federally reserved Indian fishing rights." (44 Fed.Reg. 17144 (Mar. 20, 1979).)

228), and the Alaska Statehood Act (72 Stat. 339)—permitting the Indians to use fish traps, thus granting them fishing rights not previously held. (*Id.,* at pp. 61-63 [7 L.Ed.2d at pp. 575-576].)

In holding that the Secretary lacked such authority, the court emphasized that these statutes gave the Secretary the power only to regulate the exercise of existing rights, not to grant new ones. (*Id.,* at pp. 62-63 [7 L.Ed.2d at pp. 576-577].) In addition, the court observed that none of the Indians affected belonged to any reservation. (*Id.,* at p. 62 [7 L.Ed.2d at p. 576].) The court also noted that the power conferred upon the President under 25 United States Code sections 2 and 9 did not give the Department "a general power to make rules governing Indian conduct." (*Id.,* at p. 63 [7 L.Ed.2d at p. 576].)

This case, in contrast to *Kake Village,* involves reservation Indians who fished on their reservation. More importantly, the regulations here did not *grant* Hoopa Valley Reservation Indians fishing rights as such. Instead, these rights were granted by Congress when it authorized the President to create the reservation for Indian purposes.[22] (*Arnett* v. *Five Gill Nets, supra,* 48 Cal.App.3d at p. 459, cert. den., 425 U.S. 907 [47 L.Ed.2d 757, 96 S.Ct. 1500].) Thus, even though some of the same statutes at issue in *Kake Village* provided the basis for the present regulations, the fact that fishing rights had previously been granted by other authority renders that case inapposite.

The state also contends that whatever federally created commercial fishing rights appellants possess for on-reservation activity, such rights do not include the right to sell fish off the reservation. The state argues that *Mescalero Apache Tribe* v. *Jones* (1973) 411 U.S. 145 [36 L.Ed.2d 114, 93 S.Ct. 1267] and *Ward* v. *Race Horse* (1896) 163 U.S. 504 [41 L.Ed.244, 16 S.Ct. 1076] support its position. Neither decision is on point.

In *Ward,* the United States Supreme Court held that the State of Wyoming

---

[22]It is well established that the creation of a reservation for Indian purposes encompasses the right to fish on the reservation. (*Menominee Tribe* v. *United States* (1968) 391 U.S. 404, 405-406 [20 L.Ed.2d 697, 699, 88 S.Ct. 1705]; *Quechan Tribe of Indians* v. *Rowe* (S.D.Cal. 1972) 350 F.Supp. 106, 111; *Donahue* v. *Justice Court* (1971) 15 Cal.App.3d 557, 562 [93 Cal.Rptr. 310]; see also *Kimball* v. *Callahan* (9th Cir. 1974) 493 F.2d 564, 566, cert. den., 423 U.S. 1086 [42 L.Ed.2d 292, 95 S.Ct. 530]; *Pacific Coast Fed.* v. *Secretary of Commerce* (N.D. Cal. 1980) 494 F.Supp. 626, 632.)

had the power to regulate the off-reservation killing of game by Indians. (163 U.S. at pp. 514-516 [41 L.Ed. at p. 248].) In *Jones,* the tribe operated a ski resort off the reservation. The State of New Mexico imposed a tax on the gross receipts of the resort. (411 U.S. at p. 146 [36 L.Ed.2d at p. 118].) In upholding the state's right to tax, the court stated, "[a]*bsent express federal law to the contrary,* Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." (*Id.,* at pp. 148-149 [36 L.Ed.2d at p. 119], italics added.)

Both *Jones* and *Ward* are distinguishable in at least two respects. First, the Indian activity in those cases occurred entirely off the reservation, while this case involves on-reservation fishing followed by an off-reservation sale. Second, "express federal law to the contrary" is present here. The federal regulations expressly govern off-reservation sales of reservation-caught fish and impose sanctions at odds with state law.

In a separate argument, the state asserts that Public Law 280 (67 Stat. 588 & 589, 18 U.S.C. § 1162, 28 U.S.C. § 1360) authorizes California to prohibit Indian commercial fishing on the reservation.

In 1953, Congress enacted Public Law 280, which authorized California and other named states to assume civil and criminal jurisdiction over Indians. (28 U.S.C. § 1360; 18 U.S.C. § 1162; see *Arnett* v. *Five Gill Nets, supra,* 48 Cal.App.3d at p. 459.) The statute granting states criminal jurisdiction over Indian offenses provides, however, that states are not authorized to "deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." (18 U.S.C. § 1162(b).)

The state takes the position that the above-quoted language does not apply in this case, because the fishing rights here were not based on a treaty, statute or agreement, but on an executive order. This argument was specifically rejected by the Court of Appeal in *Arnett* v. *Five Gill Nets, supra,* 48 Cal.App.3d at pages 459-462, certiorari denied, 425 U.S. 907 [47 L.Ed.2d 757, 96 S.Ct. 1500]. As the *Arnett* court held, the executive order in that case was itself promulgated pursuant to statutory authority, thus coming within the specific proscription of the 1953 provision. This holding is sound.

V.

The conclusion that the state is preempted from prosecuting appellant McCovey for violating section 8685.6 is not dispositive of appellant Wilkie's claims. As the federal regulations make clear, "[a]ny person who is not an Indian of the [Hoopa Valley] Reservation . . . is not regulated under this part . . . ." (25 C.F.R. § 250.3(b).)[23] As the commentary accompanying the most recent revision to the regulations indicates, "[b]ecause the federal regulations do not apply to [persons without Indian fishing rights], the [Bureau of Indian Affairs] relies on state enforcement to prevent illegal depletion of the resource by such individuals. It is clearly in the interest of the Indians to facilitate state enforcement of its restrictions on non-Indian fishers in order to maximize the number of fish for spawning and Indian harvest." (48 Fed.Reg. 41761 (Sept. 19, 1983).)

Since no federal regulations preempt the exercise of state jurisdiction as to appellant Wilkie's activities, the state properly exercised jurisdiction in his case. (See *Washington* v. *Confederated Tribes* (1980) 447 U.S. 134, 161 [65 L.Ed.2d 10, 34, 100 S.Ct. 2069] ["For most practical purposes those Indians (not members of the reservation) stand on the same footing as non-Indians . . . ."].)[24]

VI.

Accordingly, this court holds that federal law preempts the state from regulating the off-reservation sale or possession for sale of fish caught by

---

[23]The regulations in effect at the time of the sale in this case contained a provision substantially identical to section 250.3(b) of 25 Code of Federal Regulations. (See 44 Fed.Reg. 17148 (Mar. 20, 1979) § 258.3(b).)

[24]Appellants also argue that section 8685.6 as applied to reservation Indians for sales of reservation-caught fish discriminates against and/or burdens Indian commerce.

As to Wilkie, this argument is inapplicable, since he is not an Indian of the Hoopa Valley Reservation. Furthermore, the item of commerce involved here is a Hoopa Valley Reservation resource. Wilkie should not be able to claim discrimination against Indian commerce based on the sole fact that he is an Indian. (See, e.g., *Washington* v. *Confederated Tribes, supra,* 447 U.S. at pp. 160-161 [65 L.Ed.2d at pp. 33-34].) Lastly, the federal regulations—as a statement of tribal policy until a reservation-wide system can be organized—prohibit sale of salmon, a reservation resource, by reservation Indians. A rule that would permit Wilkie to sell salmon but prohibit reservation Indians from doing so would produce an anomalous result.

Appellants' argument that state prosecution of reservation Indians for the off-reservation sale of reservation-caught fish infringes upon the Indians' federally protected right to fish on the Hoopa Valley Reservation is also inapplicable as to Wilkie since he is not an Indian of the Hoopa Valley Reservation.

Hoopa Valley Reservation Indians on the reservation. In light of this holding, McCovey's judgment of conviction is reversed, and Wilkie's judgment of conviction is affirmed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

The petitions of appellant Wilkie and respondent for a rehearing were denied August 22, 1984.

APPENDIX

## APPENDIX TO OPINION OF THE COURT

MAP OF HOOPA VALLEY INDIAN RESERVATION, CALIFORNIA*

Scale: 1 inch = 12 miles

LEGEND:      Old Klamath River Reservation.

              Connecting Strip.

              Original Hoopa Valley Reservation.

*United States Department of Interior, General Land Office 1944.