[Civ. No. 23058.   First Dist., Div. Two.   Oct. 31, 1966.]

WILLIAM F. ELSER et al., as Fish and Game Commissioners, etc., Plaintiffs and Appellants, v. GILL NET NUMBER ONE, Defendant; GROVER REED, Intervener and Respondent.

[Civ. No. 23059.   First Dist., Div. Two.   Oct. 31, 1966.]

WILLIAM F. ELSER et al., as Fish and Game Commissioners, etc., Plaintiffs and Appellants, v. GILL NET NUMBER ONE, Defendant; DEWEY GEORGE, Intervener and Respondent.

(Consolidated Cases.)

Thomas C. Lynch, Attorney General, Ralph W. Scott and Roderick Walston, Deputy Attorneys General, for Plaintiffs and Appellants.

Faulkner, Sheehan & Wiseman and William C. Wunsch for Interveners and Respondents.

TAYLOR, J.—On this appeal by the State from adverse judgments in these consolidated actions to forfeit defendant gill nets,[1] the only question is whether the trial court properly concluded that interveners and respondents Grover Reed and Dewey George (hereafter interveners) are exempt from the provisions of the Fish and Game Code pursuant to section 12300 of that code.[2]

The basic facts are not disputed. On April 5 and 19, 1964, respectively, a department game warden seized defendant gill

---

[1] The first proceeding, No. 23058, was filed on April 24, 1964, against Grover Reed; the second, No. 23059, against Dewey George on May 14, 1964. Both respondents are designated as Gill Net Number One.

[2] The forfeiture proceedings were instituted pursuant to the authority of the State Fish and Game Department to forfeit any net in violation of the Fish and Game Code (§ 8630) by the District Attorney of Humboldt County, who also tried the matter and filed the notices of appeal. The Attorney General, who entered the case at the appeal stage, argues that the district attorney used the wrong form and erroneously filed the petitions in the names of the Fish and Game Commissioners, whose authority to institute such proceedings was vested in the Director of the

nets, as the meshes of each exceeded the mesh size permitted by sections 8664 and 8686 of the code.[3] The first net, subsequently claimed by Grover Reed, was approximately 53 feet long and 12 feet deep and was strung across the Klamath River about one-quarter mile downstream from the mouth of Pecwan Creek; the second net, subsequently claimed by Dewey George, was about 91 feet long and was in a boat partially lodged on the bank of and partially in the Klamath River near Superstition Rock. Both nets were found within that portion of the Hoopa Indian Reservation known as the Hoopa Extension.

Grover Reed and Dewey George are full-blooded Yurok or Lower Klamath River Indians,[4] descendants of Lower Klamath River Indians who were allotted specific tracts of land in the Hoopa Extension. Both were born and had lived and fished most of their lives in the area where the nets were found. Both were enrolled as Klamath River or Yurok Indians and as "wards" of the federal government on the 1931, 1937, and 1940 rolls of the Bureau of Indian Affairs (hereafter Bureau), as well as the Bureau's roll of living allottees and direct descendants of allottees on the Hoopa Extension.

The State first argues that the trial court erred in concluding that the interveners are eligible for the general exemption provided by section 12300 because they have been accorded

State Department of Fish and Game (hereafter department) in 1957. Properly amended petitions were filed by the district attorney before the judgment and findings were signed. The State's argument that the judgment is of no force or effect as the Fish and Game Commissioners had no capacity to sue and the director deprived of his day in court is without merit. Although the Attorney General is the statutory counsel for the department (Gov. Code, §§ 11040, 12511), the district attorney was acting within his power and as the representative of the department. The interveners should not be put to the expense of another proceeding simply because the district attorney used the wrong form. The liability sought to be enforced is the same regardless of who is the nominal petitioner. No new action is required (*Klopstock* v. *Superior Court*, 17 Cal.2d 13 [108 P.2d 906, 135 A.L.R. 318]). The State's argument elevates form over substance. In determining rights and obligations, substance prevails over form (*San Diego Federation of Teachers* v. *Board of Education*, 216 Cal.App.2d 758 [31 Cal.Rptr. 146]; Civ. Code, § 3528).

[3]Section 8664 provides, so far as pertinent, that any net found within 500 feet of the Klamath River is prima facie evidence of the unlawful use.

Section 8686 prohibits the use of gill nets with meshes over 1¾ inches in length in the Trinity and Klamath River district.

[4]The term "Yurok" means downriver and refers to the Klamath River Indians living along the lower Klamath downstream from the village of Weitchpec as contrasted to the "Hurok," the Klamath River Indians living along the upper Klamath upstream from the village of Weitchpec. Weitchpec is located at the junction of the Trinity and Klamath Rivers.

special and more restricted benefits by section 7155, which provides, so far as pertinent: "Right of members of Yurok Indian tribe to take fish from Klamath River: Conditions. Notwithstanding any other provision of this code, California Indians who are bona fide registered members of the Yurok Indian Tribe may take fish, for subsistence purposes only, from the Klamath River between the mouth of that river and the junction of Tectah Creek with it, exclusive of tributaries, without regard to seasons, under the following conditions." The conditions, admittedly, do not permit the type of nets here in question.

A brief history of the Hoopa Valley Indian Reservation is required for an understanding of the question presented. The Klamath River area was originally a part of the public domain transferred by Mexico to the United States in 1848 by the treaty of Guadalupe Hidalgo (*Donnelly* v. *United States,* 228 U.S. 243, 252-259 [57 L.Ed. 820, 33 S.Ct. 449]). The earliest Indian reservation in that part of northern California, known as the Klamath River Reservation, was a military reservation established by executive order dated November 16, 1855, pursuant to an Act of Congress (10 Stats. 686). It extended 20 miles up the river from its mouth, and was one mile in width on each side of the Klamath River and was subsequently inhabited by about 2,500 Indians. It was abandoned in 1861 after a disastrous flood. The Klamath River Reservation was formally terminated in 1864, when Congress enacted a statute designed to provide adequate permanent reservations for all of the Indians of California (13 Stats. 39). This statute authorized the President to set apart four tracts of land within the State of California to be retained by the United States as Indian reservations of suitable extent and for the accommodation of all of the Indians of California, and specifically directed that any existing reservations not retained were to be surveyed into lots or parcels of suitable size, to be offered for public sale (*United States* v. *Forty-eight Pounds of Rising Star Tea* (N.D.Cal. 1888) 35 F. 403, at pp. 404-405.)

Pursuant to the above statute, on April 8, 1864, the President set aside, by the posting of a public notice by the Superintendent of Indian Affairs for the State of California, four Indian reservations in California, including the Hoopa Valley Indian Reservation.[5] On June 23, 1876, President Grant, by

---

[5] Although the reservation was named for the Hoopa Valley, the valley comprised only a very small portion of the reservation's total land area.

executive order, formally defined the boundaries of the Hoopa Valley Reservation as a tract of country approximately 12 miles square, containing about 89,000 acres, lying on both sides of the Trinity River immediately above its junction with the Klamath River. No portion of the abandoned Klamath River Reservation was included in the Hoopa Valley Reservation.

Fifteen years later, on October 16, 1891, President Harrison, by executive order, enlarged the Hoopa Valley Reservation to include a two-mile-wide strip of land lying one mile on each side of the Klamath River from the original northern boundary of the reservation at the junction of the Klamath and Trinity Rivers to the mouth of the Klamath, a distance of about 40 miles. The lower 20 miles of this 40-mile-long strip of land coincided with the area of the former Klamath River Reservation. The validity of this executive order was challenged and upheld in *Donnelly* v. *United States,* 228 U.S. 243 [57 L.Ed. 820, 33 S.Ct. 449].[6] The *Donnelly* opinion further pointed out (at pp. 258, 259) that in the year immediately following President Harrison's executive order, the extended area was occupied by the Lower Klamath Tribe, whose principal subsistence was fishing.

In 1887 Congress passed the General Allotment Act (25 U.S.C.A., §§ 331, 358) designed to break up the reservations and allot specific parcels of land to individual Indians, the land remaining after allotment to be opened for settlement. Accordingly, in 1892 Congress passed a Special Act directing that the area of the old Klamath River Reservation be immediately opened for public purchase (27 Stats. 52). Thus, the lower 20 miles of the 40-mile-long strip of land included in the 1891 extension of the Hoopa Valley Reservation, for all practical purposes, almost immediately lost its identity as part of the Hoopa Valley Reservation. However, the upper 20 miles of the strip was not affected by the Act of 1892, has remained an integral part of the Hoopa Valley Reservation to the present time, and has become commonly known as the Hoopa Extension or Hoopa Extension Reservation.

The language of section 7155 indicates that the State's contention (made clearly for the first time on appeal)[7] is entirely without substance. Section 7155, which has been a

[6]The subsequent modification of a portion of the opinion, *Donnelly* v. *United States,* 228 U.S. 708 [57 L.Ed. 1035, 33 S.Ct. 1024], has no bearing on this aspect of the case.

[7]Although the section was cited in the petitions, no argument predicated thereon was made. We have chosen to treat the matter on its merits.

part of the Fish and Game Code since 1951,[8] grants to bona fide registered members of the Yurok or Lower Klamath Tribes the privilege of taking fish without regard to seasons, under certain prescribed conditions, in that strip of the Klamath River extending upstream from its mouth to its junction with Tectah Creek, namely, the portion of the Klamath River that was encompassed by the old Klamath River Reservation, which was affected by the 1892 statute, and has never been any part of the Hoopa Extension. Nor can we agree that the section 7155 grant of limited fishing privileges in an area beyond the reservation is an unconstitutional discrimination in favor of the Yuroks, or in any way limits the general privileges granted by section 12300, *on the reservation.*

It is undisputed in the instant case that the two locations at which the interveners' nets were found were within the boundaries of the Hoopa Extension and not in the area to which section 7155 relates. ▮ We hold that the trial court properly concluded that section 7155 merely grants members of the Yurok or Lower Klamath Tribes certain limited special fishing privileges in an area that was part of their ancestral lands, but which area has not been regarded as part of the reservation since 1892.

We turn, therefore, to the State's chief contention on appeal, namely, that the trial court erred in holding that section 12300 immunized the interveners from the prohibitory provisions of the Fish and Game Code as the interveners did not meet all of the requirements specified therein. Section 12300 provides: ''Irrespective of any other provision of law, the provisions of this code are not applicable to California Indians whose names are inscribed upon the tribal rolls, while on the reservation of such tribe and under those circumstances in this State where the code was not applicable to them immediately prior to the effective date of Public Law 280, Chapter 505, First Session, 1953, 83d Congress of the United States.[9]

---

[8]The section was originally Fish and Game Code section 429.8 added by Statutes of 1951, chapter 1486, section 1, page 3467, and has not been substantially changed.

[9]Public Law 280, 83d Congress, 18 U.S.C.A. § 1162, provides, so far as pertinent: '' (a) Each of the States or Territories listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same

"No such Indian shall be prosecuted for the violation of any provision of this code occurring in the places and under the circumstances hereinabove referred to. Nothing in this section, however, prohibits or restricts the prosecution of any Indian for the violation of any provision of this code prohibiting the sale of any bird, mammal, fish, or amphibia."

A brief history of secton 12300 and the federal statute cited is necessary for an understanding of the question presented. Because of the disastrous effect of the General Allotment Act of 1887 on Indians, Congress in 1934 enacted the Indian Reorganization Act (Act of June 18, 1934, 48 Stats. 984; 25 U.S.C.A. § 461 et seq.). This act applied only to Indian tribes voting to accept it and was an abrupt reversal of the prior policy of assimilation in its prohibition of future allotments of Indian lands. It also provided for the purchase of land to be held in trust for Indians by the federal government and for tribal government and tribal incorporation for credit. In 1953, a shift in policy toward assimilation was evidenced by the adoption of House Concurrent Resolution 108, providing that all Indian tribes should be freed from federal supervision and control and from all disabilities and limitations specifically applicable to Indians and directed the Secretary of the Interior to recommend the necessary legislation (1961 U.S. Commission on Civil Rights Report, vol. 5, p. 123). In accordance with this policy of termination, Congress passed Public Law 280 granting to several states, including Cali-

---

force and effect within such Indian country as they have elsewhere within the State or Territory:

| "State or Territory of | Indian country affected |
|---|---|
| Alaska | All Indian country within the Territory |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute, with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

fornia, full civil and criminal jurisdiction over Indian reservations (18 U.S.C.A. § 1162; 28 U.S.C.A. § 1360). This statute, the pertinent portion of which is quoted above, disclaims the intention to permit states to interfere in the federally granted fishing privileges or uses of property.

At the time of the enactment of Public Law 280, there were no ratified treaties on any subject between the United States and any California Indians (*Indians of California* v. *United States*, 98 Ct. Cls. 583, cert. denied [87 L.Ed. 1714, 63 S.Ct. 1324] (1943); *Acosta* v. *County of San Diego*, 126 Cal.App.2d 455, 463 [272 P.2d 92]) and no federal statutes dealing with Indian fishing and hunting rights. To eliminate any doubt that California Indians could continue to exercise their traditional hunting and fishing privileges on their reservations, the California Legislature, in 1955, added to the Fish and Game Code section 1418 (Stats. 1955, ch. 389, § 1) which in the 1957 revision of that code was renumbered 12300. As originally enacted, the section referred only to ''California Indians, whose names are inscribed upon the tribal rolls . . .'' In 1961, the Legislature added the words ''while on the reservation of such tribe'' (Stats. 1961, ch. 963, § 1).

■ From the above and from the language of 18 U.S.C.A. § 1162, as well as the history of the relations between the Indians and the states set forth in *Kake Village* v. *Egan*, 369 U.S. 60, at 71-73 [7 L.Ed.2d 573, 82 S.Ct. 562], we think it cannot be questioned that prior to effective date of Public Law 280, the Fish and Game Code was not applicable to the interveners[10] under the circumstances here presented (see also *Anderson* v. *Mathews*, 174 Cal. 537, 544 [163 P. 902]; *Acosta* v. *County of San Diego*, 126 Cal.App.2d 455, 464, 465 [272 P.2d 92]).[11]

■ We turn, therefore, to the question of whether the interveners meet the requirements of section 12300 of the Fish and Game Code. As it is not disputed that they are California Indians, we turn to the question of whether they were: 1) inscribed on the tribal rolls while 2) on the reservation of such tribe.

---

[10]It was not argued below or shown that the State had ever attempted to enforce its Fish and Game laws on the reservation prior to Public Law 280.

[11]If there had been a treaty or formal agreement with the federal government there would have been no need for the enactment of section 12300 (*Metlakatla Indian Community* v. *Egan*, 369 U.S. 45 [7 L.Ed.2d 562, 82 S.Ct. 552]), nor would the State have had the power to do so (*Klamath & Modoc Tribes* v. *Maison* (9th Cir. 1964) 338 F.2d 620).

The State argues that the above language of section 12300 applies only to Indians living in a tribal relation and subject to the laws, custom and jurisdiction of their tribe, and that the records on which the interveners' names were inscribed were not "tribal rolls" within the meaning of the statute. We do not agree. At best, the language used in the statute is somewhat ambiguous. It is well settled that all such ambiguities must be construed in favor of the Indians (*Tulee* v. *Washington,* 315 U.S. 681 [86 L.Ed. 1115, 62 S.Ct. 862]; *Alaska Pacific Fisheries* v. *United States,* 248 U.S. 78 [63 L.Ed. 138, 39 S.Ct. 40]).

The contention that the interveners as Yurok or Lower Klamath Indians are not entitled to the benefits of section 12300 because they are not governed by a council or subject to tribal laws, is not supported by the anthropologists. As indicated by Professor A. L. Kroeber in his monograph "The California Indians," "Tribes did not exist in California in the sense in which the word is properly applicable to the greater part of the North American continent. When the term is used it must therefore be understood as synonymous with 'ethnic group' rather than as denoting political unity" (*Acosta* v. *County of San Diego,* 126 Cal.App.2d 455, 465 [272 P.2d 92]). In accord is the fact that the Act of April 8, 1864, discussed above, authorized the creation of four reservations to accommodate all of the Indians of California. Thus, the Hoopa Valley Reservation and the Hoopa Extension were set aside for the Indians living there, not for the benefit of any particular tribe. The record indicates that seven different tribes live on the Hoopa Valley Reservation. The Yurok or Lower Klamath Tribe has lived in the area of the Hoopa Extension since 1855 (*United States* v. *Forty-eight Pounds of Rising Star Tea, supra,* p. 404; cf. *Donnelly* v. *United States, supra,* at p. 258). We think the statute simply requires that the Indians benefited be members of a recognized tribe. The mere fact that the Yurok or Lower Klamath Indians do not have a formal tribal organization[12] similar to that of the Hoopa Valley Tribe is not a sound basis for distinction, particularly since the absence of such organization is most probably the result of the frequent recognized reversals of federal policy regarding the assimilation of Indians and the encouragement of tribal independence and self-government.

---

[12]The State urges us to take judicial notice of the incorporation of the Yurok Tribal Organization in 1949 (Code Civ. Proc., § 1875).

In view of all of the above, we cannot agree with the State's contention that the requirement of living in a "tribal relation" must be read into the statute. We hold, therefore, that the Legislature intended to accomplish nothing more by the eligibility requirements of section 12300 than to assure that an Indian claiming the benefits of the section was actually fishing on a reservation where he had tribal rights.

Thus, the manifest purpose of the inclusion of a requirement that Indians eligible for the benefit of the section have their names inscribed on a tribal roll was not to require a particular kind of roll as the State urges, but was simply to assure that eligible Indians could be determined by a written record confirming their membership in a particular tribe and their rights on a particular reservation. ■ The uncontroverted record indicates that on the special rolls kept by the Department of Indian Affairs for the Hoopa Valley Reservation in 1931, 1937 and 1940, the interveners' names were inscribed on the rolls as full-blooded Indians and as members of the Yurok or Lower Klamath Tribe. The record does not support the State's contention that these rolls were simply a census of Indian residents. The Superintendent of Indian Affairs indicated that the rolls were prepared, not as a record of all Indians living in the jurisdiction but merely to identify those entitled to tribal rights on the Hoopa and Lower Klamath, including the distribution of tribal assets.[13]

This conclusion is borne out by the instructions for the preparation of these rolls. The instructions state that the roll is "to be based on enrollment and not on residence. . . . Care is to be taken that tribe, not band or local name, is given." Furthermore, the instructions required a notation as to whether or not the Indian enrolled was a "ward" of the federal government, and indicated that "wardship" depends primarily on the ownership of individual property held in trust or upon membership in a tribe living on a federal

---

[13]It appears that most of the tribal rolls were kept by the federal government for this purpose. In 1928 a jurisdictional act was passed (45 Stats. 602) for the enrollment of California Indians who were then living in California or whose ancestors were living in the state in 1852 (25 U.S.C.A. § 657). In June of 1948 another act was passed providing for the enrollment of children then living and born since 1928 to enrollers. In 1950 another act was passed for a further enrollment of certain Indians and to determine eligibility for a per capita payment of $150, from funds deposited to their credit from a 1944 judgment recovered against the federal government in the Court of Claims (25 U.S.C.A. §§ 652-658; 1954 U.S. Code Cong. & Adm. News, p. 2333; *Reed* v. *United States National Bank of Portland* (Ore. 1963) 213 F.Supp. 919).

reservation (cf. 1961 U.S. Commission on Civil Rights Report, vol. 5, pp. 128-129). The roll of descendants of allottees on the Hoopa Extension also indicated tribal rights. The State's own witness, Laura Ferris, the secretary of the Hoopa Valley Tribe, testified that her membership in that tribe was based on the fact that she was a descendant of an allottee in the Hoopa Valley Tribe.

Thus, the interveners were enrolled on several official records of the Bureau of Indian Affairs as members of a recognized tribe with recognized tribal rights. *Anderson* v. *Mathews*, 174 Cal. 537 [163 P. 902], which concerned an Indian who was not a member of or a descendant of any tribe recognized by the United States is not relevant here. We hold that the interveners met the "tribal roll" requirement of section 12300. It follows that the trial court properly concluded that the interveners met all of the requirements of section 12300 and were entitled to the exemption from the provisions of the Fish and Game Code.

While the above sufficiently disposes of the matter before us, and we need not discuss the State's other arguments as they are raised for the first time on appeal, we briefly wish to comment on some of these matters.

■ As to the contention that the nets were not used in the traditional manner and were in and of themselves an indication that the interveners were fishing for commercial purposes, we note that historically the Yurok or Lower Klamath Tribe traditionally used very large nets made of two-ply cordage in fishing on the Klamath River (Kroeber, Handbook of the Indians of California, Bureau of American Ethnology, 78, p. 85, U.S. Government Printing Office 1925). There is nothing in the record to indicate that any fish were caught by the interveners or sold in commercial quantities. If the latter in fact was the case, the exemption provided by section 12300 would not apply as the final sentence of the statute indicates.

■ As to the contention that the trial court erred in its additional finding that there was an "agreement" within the meaning of Public Law 280, we hold that the court properly concluded that Congress intended the term "agreement" to encompass agreements other than formal written agreements. The identical language has been construed by the United States Supreme Court to be a broad preservation of federally granted fishing rights, including those based on regulation (*Metlakatla Indian Community* v. *Egan*, 369 U.S. 45, 57-59 [7 L.Ed.2d 562, 82 S.Ct. 552]). As it is undisputed that since

1855 the Lower Klamath Indians, whose main subsistence was fishing, have fished in the area in question and that even in the absence of any treaties or formal agreement, their right to do so was apparently informally recognized by the federal government prior to the enactment of Public Law 280, we think the trial court's conclusion was correct.[14]

We deem it unnecessary to discuss the State's remaining contentions which are raised for the first time on appeal.

The judgments are affirmed.

Shoemaker, P. J., and Agee, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 28, 1966. Mosk, J., did not participate therein.

---

[14]We note that if the trial court had found that a formal agreement existed, it would have lost jurisdiction.