Filed 4/18/13  Partridge v. Campbell CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MARIANNE PARTRIDGE, et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>RANDY CAMPBELL,<br><br>    Defendant and Appellant. | 2d Civil No. B237772<br>(Super. Ct. No. 1341942)<br>(Santa Barbara County) |

        Randy Campbell appeals from the judgment entered in favor of Marianne Partridge, respondent, after a court trial.  The judgment requires appellant to sell to respondent all of his shares in the Santa Barbara Independent, Inc. (the Independent).  The judgment was based on the trial court's finding that respondent accepted appellant's offer to sell his shares before he withdrew it.  Appellant contends that, as a matter of law, respondent did not validly accept his offer.  Appellant further contends that, if a valid acceptance occurred, respondent was not entitled to specific performance of the contract because she failed to prove the amount of a "true-up" adjustment to the purchase price.  We remand the matter to the trial court with directions to determine the true-up adjustment and to recalculate the purchase price in light of this adjustment.  In all other respects, we affirm.

*Facts*

The Independent publishes a newspaper, the Santa Barbara Independent. Appellant owned 1,530 shares, 51 percent of the total outstanding shares. The remaining 49 percent (1,470 shares) was divided equally among three shareholders: respondent, Richard Parker, and Richard Grand-Jean (the minority shareholders). Appellant was the publisher of the newspaper. Respondent was the editor-in-chief of the newspaper and secretary of the corporation.

On November 10, 2009, appellant gave notice to the Independent and the minority shareholders of his "intention" to sell all of his shares to Southland Publishing (Southland) pursuant to an offer dated November 4, 2009. The offer was attached to appellant's notice. The offer stated that Southland would purchase the Independent for $2.7 million, "plus or minus a true-up of 'Net Cash, Receivables and Payables.' " The "true-up" was explained as follows: "To the extent that [the Independent's] 'Net Cash, Receivables and Payables' at Closing is [*sic*] more or less than $700,000, the difference will be added or subtracted to the final payment due 1 year following the Closing. . . . [F]or example, if the true-up reveals 'Net Cash, Receivables and Payables of $750,000, then $50,000 in total will be added to Southland's final payment to the shareholders."

Pursuant to the offer, appellant would receive $1.377 million and each of the minority shareholders would receive $441,000, plus or minus the true-up adjustment. At the time of the closing, 50 percent of the purchase price would be paid. Another 25 percent would be paid within six months of the closing, and the final 25 percent would be paid within one year of the closing. The offer said that it was not binding "as Southland Publishing shall be entitled to conduct due diligence, and material terms are not herein included."

Appellant's notice stated that the "procedures to accomplish this sale" must conform to the right of first refusal procedures set forth in a document entitled "Stock Purchase and Buy-Sell Agreement" (Agreement). Appellant enclosed a copy of the Agreement, which was signed in 1986 by the Independent and its shareholders. The

Agreement provides that no shareholder may sell his shares without first giving the Independent the option to purchase them "at the price and on the terms" offered to the shareholder. If the Independent does not exercise its option within 45 days, the Independent must notify the non-selling shareholders. They will have an option to purchase the shares that must be exercised within 20 days after receiving notice from the Independent. Each of the non-selling shareholders may purchase "such proportion of the Noticed shares . . . as the number of Shares held by him, her or it bears to the number of Shares held by all of such other Shareholders." If a shareholder decides not to purchase his or her proportion of the noticed shares, the remaining shareholders may elect to purchase it, provided that they give notice of their election within the same 20-day period. If the non-selling shareholders elect to purchase fewer shares than the selling shareholder has offered to sell or do not exercise their options within the 20-day period, the options will expire. At any time before the options are exercised, the selling shareholder may withdraw his notice of intention to sell his shares.

On November 23, 2009, the Independent's Board of Directors (Board) met to consider the corporation's option to purchase appellant's shares. Appellant and respondent were the only Board members personally present. The other Board members - Parker and Grand-Jean - participated by telephone.

Before the meeting began, respondent handed a document to appellant and stated, " 'This is my exercise of the Buy-Sell Agreement.' " Appellant asked, " 'Is it for all or some?' " Respondent replied, " 'All or some.' " Appellant said, " 'Good. Good.' " In the document respondent stated that she was exercising her option to purchase all of appellant's shares that were not purchased by the Independent and other shareholders.[1]

---

[1] Respondent wrote: "As a shareholder of the Company, I hereby exercise my option under the Buy-Sell Agreement to purchase all of the Shares of the Company now owned by [appellant] (up to 1,530 shares) at the price and on the terms stated in his November 10, 2009 Offering Notice or as otherwise determined in accordance with the Buy-Sell Agreement to the extent that such Noticed Shares are not purchased by the Company at the Board of Directors meeting. [¶] I understand that under the Buy-

The Board voted to not exercise its option to purchase appellant's shares. Grand-Jean said, " '[W]e want to find out who wants to buy [appellant's] shares now.' " Respondent said that she would buy all of his shares, and she read aloud the document that she had delivered to appellant before the meeting began. Appellant asked who wanted to sell his shares to Southland. Grand-Jean "said that he didn't want to sell, and Parker said for the purposes of this meeting he didn't want to sell."

Immediately after the Board meeting, the Independent sent a letter to the minority shareholders informing them that the Board had voted to not exercise the corporation's option to purchase appellant's shares. The letter stated that the minority shareholders could elect to personally purchase his shares pursuant to the Agreement.

The next day, November 24, 2009, respondent redelivered to appellant the written notice of acceptance that she had given him the previous day before the Board meeting. Appellant told her that he was considering another offer from Southland. Respondent replied that she had already accepted his offer of November 10, 2009, so he could not withdraw it. Appellant said: " 'No. That's not true. I can withdraw it at any time. And I'm weighing both offers." Respondent testified: "I kept saying, 'You can't weigh both offers. There's only one offer now.' He kept saying, 'Yes, I can. I can withdraw it any time.' "

On November 30, 2009, Southland submitted a revised offer to purchase the Independent. The purchase price was the same, but Southland agreed to pay it in full within 15 days of the closing. The true-up provision was modified, and Southland offered to employ appellant as publisher for three years at a base annual salary of $110,000. Appellant could not be terminated except for fraud or gross negligence. At

---

Sell Agreement, the other Shareholders (other than [appellant] as the Offering Shareholder) may exercise their options to purchase a portion of the Noticed Shares by notifying me as Secretary within the period specified in the Buy-Sell Agreement of any such intention. In such case, all of the Noticed Shares shall be apportioned for purchase among the shareholders (other than [appellant] as the offering shareholder) in accordance with the Buy-Sell Agreement." (Bold omitted.)

the time of the revised offer, appellant was receiving an annual base salary of $55,000. Like the original offer, the revised offer stated that it was not binding.

On December 2, 2009, appellant emailed the revised offer to the minority shareholders. Appellant said that the revised offer could be treated as "a brand new proposal" that "will restart the timing and noticing as outlined in the Buy-Sell" agreement or "as simply an updated offer, still conforming to the procedures we have already started."

Respondent's counsel wrote the following reply to the email: "The November 30 revised proposal is irrelevant to your existing contractual obligations. On November 10 you offered to sell your shares, and your offer has been unconditionally accepted in writing; you are a party to an enforceable contract for the sale of your shares in the Santa Barbara Independent Inc." Counsel noted that Southland's "new proposal contains different payment terms and a new provision regarding your employment."

On December 11, 2009, shareholder Richard Parker gave notice that he was exercising his option to purchase up to 270 of appellant's 1530 shares "at the price and on the terms stated in the November 10, 2009 Offering Notice." On December 18 shareholder Richard Grand-Jean gave notice he would not purchase any shares.

On December 29, 2009, respondent wrote a letter to all shareholders stating that, pursuant to appellant's offering notice of November 10, 2009, she would purchase 1,260 shares for $1.134 million and Parker would purchase 270 shares for $243,000. The purchase price would later be adjusted pursuant to the true-up provision in the offering notice. Respondent said that the transaction would close on January 12, 2010.

The same day it was written, respondent's letter was hand-delivered to appellant. Appellant immediately sent an email to the minority shareholders complaining that they had ignored Southland's revised offer. Appellant said: "In case it's not clear, I rejected Southland's original offer November 23." Appellant contended that respondent's purported acceptance of his offer of November 10, 2009, "before the Board had voted to not exercise their rights under the Buy-sell agreement . . . does not

5

follow the procedures as outlined [in the Agreement]."  Appellant continued: "At this point we have an offer that has been rejected, and a new offer from Southland pending Board and Shareholder review.  [¶]  Ignoring the new offer appears to be a coordinated effort to deny the best possible deal for the sale of Independent shares . . . ."  Appellant requested that the Board set a date for a meeting to discuss Southland's new offer.

After appellant refused to sell his shares to respondent and Parker, respondent filed against him a complaint consisting of three causes of action: breach of contract, breach of covenant of good faith and fair dealing, and breach of fiduciary duty.  In addition to the recovery of damages, respondent sought "a decree of specific performance ordering that [appellant]" deliver his 1,530 shares to her "in exchange for the payment of $1,377,000."  Appellant filed a cross-complaint against respondent.

Parker is not a party to the lawsuit.  He assigned to respondent his claim to the 270 shares that he had elected to purchase.

### Statement of Decision and Judgment

The matter was tried by the court without a jury.  In its statement of decision, the trial court concluded that respondent had accepted appellant's "offer in writing on November 23, 2009 before [he] withdrew it."  Her acceptance created "an enforceable contract, and [she] is entitled to specific performance."

On respondent's complaint, judgment was entered in appellant's favor on the cause of action for breach of fiduciary duty.  Judgment was entered in respondent's favor on the causes of action for breach of contract and for breach of covenant of good faith and fair dealing.  The judgment decreed: "[Respondent] is entitled to purchase all of [appellant's] 1530 shares of the Santa Barbara Independent, Inc."  Appellant was ordered to transfer his shares to respondent upon the deposit of the purchase price.  The court determined the purchase price to "be $1,241,742.00 as of July 21, 2011, based upon $1,377,000.00 as the sale price . . . less $229,793.00 distributions of profits made to [appellant] after January 12, 2010, plus 5% interest on the outstanding balance through July 21, 2011."  The judgment does not mention the true-up adjustment.  In its

6

statement of decision, the trial court concluded that the true-up was "not applicable to the purchase price."

On appellant's cross-complaint, judgment was entered in favor of respondent. As to the entire action, the court declared respondent to be the prevailing party and awarded her reasonable attorney fees of $358,742.

*Preemptive Rights and Options: Legal Principles*

The Agreement gave the Independent and the minority shareholders a right of first refusal, also known as a preemptive right, to purchase appellant's shares if he decided to sell them to a third party. "[A] preemptive right gives the holder the first right to buy when and if the owner later wants to sell. If the holder does not buy, the owner of the property may sell to anyone. Conversely, an option gives the holder a power to compel a sale regardless of whether the owner then wants to sell. [Citations.]" (*Rollins v. Stokes* (1981) 123 Cal.App.3d 701, 710.) "[W]hen [appellant] manifested [his] intent to sell . . . and subsequently notified [the Independent], the preemptive right was activated." (*Id*., at p. 710.) At that time the preemptive right ripened into an "option to purchase, that is an option, within a stated time, to purchase on the same terms and conditions as the prospective purchaser's offer." (*McCulloch v. M & C Beauty Colleges, Inc.* (1987) 194 Cal.App.3d 1338, 1345.) " 'An option is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract. [Citations.]' [Citation.]" (*Steiner v. Thexton* (2010) 48 Cal.4th 411, 420.) "[W]hen the provisions of an option contract prescribe the particular manner in which the option is to be exercised, they must be strictly followed. [Citations.]" (*Palo Alto Town & Country Village, Inc. v. Bbtc Company* (1974) 11 Cal.3d 494, 498.)

*Respondent's Option Was Transformed into an*
*Enforceable Contract of Purchase and Sale*

7

*Standard of Review*

"[W]hen the decisive facts are undisputed, the reviewing court is confronted with a question of law and is not bound by the findings of the trial court. [Citation.] In other words, the appellate court is not bound by a trial court's interpretation of the law based on undisputed facts, but rather is free to draw its own conclusion of law. [Citation]." (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528; accord, *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 ["When the decisive facts are undisputed, we are confronted with a question of law and are not bound by the findings of the trial court"].)

The decisive facts are undisputed as to whether respondent's purported acceptance of appellant's offer transformed her option into an enforceable contract of purchase and sale. "In the absence of any controverted factual evidence . . . , we are presented with a pure question of law for which the appropriate review is de novo. [Citation.]" (*Miller v. Ellis* (2002) 103 Cal.App.4th 373, 378.) The de novo standard of review is especially appropriate because the resolution of this issue depends in large part upon our interpretation of the Agreement. (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [" 'An appellate court is not bound by [the trial court's] construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], [or] where there is no conflict in the evidence [citations]' "]; *Rooz v. Kimmel* (1997) 55 Cal.App.4th 573, 585 ["Because the trial court construed the indemnity and hold harmless provision without the aid of conflicting extrinsic evidence, the interpretation of that agreement is a question of law for this court"]).

*Discussion*

Appellant contends that respondent's acceptance of his offer to sell all of his shares was invalid and did not create an enforceable contract of purchase and sale. Appellant's reasoning is as follows: Because respondent owned one-third of the minority shareholder's shares, she had an option to purchase no more than one-third of appellant's shares. Pursuant to the Agreement, each minority shareholder was entitled

8

to purchase "such proportion of the Noticed shares . . . as the number of Shares held by him, her or it bears to the number of Shares held by all of such other Shareholders." Respondent would be entitled to purchase the remaining two-thirds of appellant's shares only if Parker and Grand-Jean declined to exercise their options. On December 2, 2009, before Parker and Grand-Jean decided whether to exercise their options, appellant withdrew his previous offer to sell by informing the minority shareholders of Southland's revised offer. (See *Distefano v. Hall* (1968) 263 Cal.App.2d 380, 385 ["any new offer communicated prior to a valid acceptance of a previous offer, extinguishes and replaces the prior one"].) Thus, after receiving notice of Southland's revised offer, the minority shareholders could not have accepted appellant's previous offer to sell his shares on the same terms as Southland's original offer. Appellant's previous offer had been revoked.

Appellant's argument has some appeal. The Agreement provides: "The Offering Shareholder may withdraw the Notice and the offer to sell the Noticed Shares at any time prior to the exercise of the *options* as provided in this [Agreement] . . . ." (Italics added.) The term "options" is in the plural instead of the singular form. The use of the plural makes clear that the offer to sell does not become irrevocable merely because a single shareholder has exercised her *option* to purchase her pro rata share.

Respondent, however, did not just exercise her option to purchase her pro rata share. She legally bound herself to purchase all of appellant's shares that were not purchased by Parker and Grand-Jean. Thus, on November 23, 2009, appellant knew that he had a commitment from the minority shareholders to purchase all of his shares pursuant to the terms of Southland's original offer. Since Parker and Grand-Jean had not yet exercised their options, appellant did not know how many shares, if any, they would purchase. But it was of no concern to appellant how many shares each minority shareholder would purchase so long as he had assurances that all of his shares would be purchased.

Like other contracts, an option contract must " ' "be fairly construed with a view to effect the object for which it was given and to accomplish the purpose for which it

9

was designed." ' [Citations.]" (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 39; see also *Howe v. American Baptist Homes of the West, Inc.* (1980) 112 Cal.App.3d 622, 626 [" 'a contract entered into for the mutual benefit of the parties is to be interpreted so as to give effect to the main purpose of the contract and not to defeat the mutual objectives of the parties' "].) Here, the option contract had a dual purpose. One purpose was to afford the non-selling shareholders a 20-day period to determine whether to purchase the selling shareholder's shares. The other purpose was to enable the selling shareholder to go forward with the proposed sale to a third party if the non-selling shareholders did not commit themselves to the purchase of all of his shares within the 20-day period.

Respondent's acceptance of November 23, 2009, fulfilled this dual purpose. At the beginning of the 20-day period, she irrevocably committed herself to the purchase of all of appellant's shares that Parker and Grand-Jean did not elect to purchase. We would be exalting form over substance were we to hold that respondent's acceptance did not create an enforceable contract merely because Parker and Grand-Jean had not yet exercised their options to purchase their pro rata share. "In determining rights and obligations, substance prevails over form [citation]." (*Elser v. Gill Net No. One* (1966) 246 Cal.App.2d 30, 31, fn. 2.)

Furthermore, appellant's interpretation of the option contract would lead to unintended, absurd results. (See *Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1009 [" ' "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting" ' "]; *Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 651 ["we must interpret a contract in a manner that is reasonable and does not lead to an absurd result"].) According to appellant's interpretation, respondent could not have accepted as to Grand-Jean's one-third pro rata share until after Grand-Jean had elected whether to purchase his share. Appellant asserts: "[N]o enforceable contract obligation could possibly exist until all the players designated by the Buy-Sell Agreement's first-refusal process - *The Independent*, Parker and Grandjean [*sic*], not just [respondent] - decided

10

whether to exercise their separate and independent first-refusal rights." Grand-Jean did not elect whether to purchase his pro rata share within the 20-day option period. On December 18, 2009, 25 days after the Independent had notified the minority shareholders of appellant's offer to sell, Grand-Jean gave notice that he would not purchase any of appellant's shares. Thus, even if appellant had kept his original offer open throughout the 20-day period, respondent could not have accepted as to Grand-Jean's one-third pro rata share within that period. The options would have expired and appellant would have been free to sell his shares to Southland.

The parties to the Agreement did not intend that, by failing to act within the 20-day period, a single shareholder would have the power to block a sale to other shareholders who were willing and able to make the purchase and had timely exercised their options.[2] The parties intended to facilitate the other shareholders' purchase so that they would not have to deal with a third-party interloper. If a shareholder did not elect to buy his pro rata share, the other shareholders could elect to do so provided that they gave notice of their election within the 20-day period. Respondent's acceptance of November 23, 2009, provided the requisite notice. Her acceptance assured that all of appellant's shares would be sold to the minority shareholders irrespective of what Parker and Grand-Jean did or did not do. Since her acceptance was irrevocable and occurred within the 20-day option period before appellant gave notice of Southland's revised offer, appellant has no cause for complaint. Respondent made " 'an unconditional, unqualified acceptance . . . of [appellant's] offer in harmony with the terms of the option and within the time span of the option contract. ' " (*Steiner v.*

---

[2] Grand-Jean did not intend to block respondent's purchase of appellant's shares. In his deposition, Grand-Jean testified that he wanted respondent to purchase appellant's shares: "[O]nce we received this communication from [appellant] that he had had meetings with Southland and had agreed to sell his shares to them, I was very much opposed to that. . . . And I welcomed wholeheartedly [respondent's] willingness and ability to match that offer and buy the shares. . . . [¶] So if you want to look at this just in terms of a deal context, I was on [respondent's] side and against [appellant]."

11

*Thexton*, *supra*, 48 Cal.4th at p. 420.)  Accordingly, the option was " 'transformed into a contract of purchase and sale.' "  (***Ibid***.)

## True-Up

Appellant contends that respondent was not entitled to specific performance of the contract of purchase and sale because she failed to prove the amount of the true-up. Appellant argues, "[T]here could be no determinative purchase price without inclusion of the True-Up adjustment."

Respondent was not at fault for the absence of proof of the true-up.  The trial court denied respondent's request for an opportunity to prove the true-up.  During closing argument, respondent's counsel said that, if the court decided that his client was entitled to specific performance, "we have to deal with the calculation of the true-up."  Counsel continued: "As part of your Honor's order, what we would ask is that [respondent] be given an opportunity to have the business records of the Independent, to carry out that true-up, present it to the other side.  If they disagree, you could have a hearing on it.  It would easily be decided within the next 15 to 30 days.  So that true-up would be a cash addition or deduction from the purchase price that [appellant] is to be paid."

Appellant did not object to this proposed procedure for calculating the true-up. By failing to object, he acquiesced in the procedure.  (See *People v. McKinnon* (2011) 52 Cal.4th 610, 644; *People v. Espinoza* (1979) 99 Cal.App.3d 59, 64, fn. 2.)  But in its statement of decision, the trial court concluded that the true-up was "not applicable to the purchase price."[3]

Appellant in effect is claiming that the trial court erroneously refused to allow proof of the true-up because it erroneously determined that the true-up was not

---

[3] In its statement of decision, the trial court did not explain why it had concluded that the true-up was inapplicable.  In its oral decision immediately following submission of the case, the trial court stated: "I find that the true-up is not applicable.  The Southland proposal makes for interesting background information, but it is neither here nor there. . . . [The minority shareholders] simply have the opportunity to match the offer for the shares and that's it.  That's the end of the story."

12

applicable to the purchase price. We agree. The true-up was an integral part of the purchase price. In his notice of intent to sell his shares to Southland, appellant stated: "I own 1,530 shares and will accept $1,377,000 as outlined in the Southland Offer Sheet . . . . [¶] Payment terms and the mechanics of the 'True-Up' of cash receivables, and payables are . . . detailed in the Southland offer." The matter, therefore, must be remanded to the trial court for calculation of the true-up adjustment to the purchase price.

*Disposition*

The judgment is reversed only as to the purchase price for appellant's shares. The matter is remanded to the trial court with directions to determine the true-up adjustment and to recalculate the purchase price in light of this adjustment. In all other respects, the judgment is affirmed. Respondent shall recover her costs on appeal.

<u>NOT TO BE PUBLISHED.</u>


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

13

Denise de Bellefeuille, Judge

Superior Court County of Santa Barbara

_____

Griffith & Thornburgh, John R. Rydell and John C. Eck. Greines, Martin, Stein & Richland; Irving H. Greines and Edward L. Xanders, for Appellant.

Gary J. Hill and Timothy J. Trager; Reicker, Pfau, Pyle & McRoy, for Respondents.